STEVEN G. KALAR
Federal Public Defender
ROBERT CARLIN
Assistant Federal Public Defender
55 S. Market Street, Suite 820
San Jose, CA  95113
Telephone:  (408) 291-7753
Email: robert_carlin@fd.org

Counsel for Defendant
JESUS SALINAS

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>MARIA GUADALUPE VALENZUELA,<br>PATRICIA DELATORRE,<br>JESUS SALINAS,<br><br>    Defendants. | No. CR-12-00887 EJD<br><br>**DEFENDANT JESUS SALINAS'<br>MOTION TO DISMISS INDICTMENT<br>DUE TO MATTERS OCCURRING<br>BEFORE GRAND JURY, INCLUDING<br>MATERIAL FALSE TESTIMONY; FALSE<br>DESCRIPTIONS OF KEY WITHHELD<br>EVIDENCE; AND VOUCHING**<br><br>Date: October 21, 2014<br>Time: 9 a.m.<br><br>Honorable Edward J. Davila |

# TABLE OF CONTENTS

I.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    List of Material False or Misleading Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     (1)   Immigration Status of Ms. Hernandez . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     (2)   Location of Children . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     (3)   Alleged Lack of Connection to Salinas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     (4)   Denial of Border Crossing Attempt in 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     (5)   Alleged Lack of Consent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     (6)   Alleged Absence of Childcare Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     (7)   Alleged Dissuasion from Calling Police . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     (8)   Alleged Motive for Leaving Washington in 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     (9)   Reason for Termination of Communication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     (10)  Alleged Concern about Immigration Consequences . . . . . . . . . . . . . . . . . . . . . . . 9

     (11)  Alleged Refusal to Return Children . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     (12)  Content of Recorded Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     (13)  Status of Children . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     (14)  Location of Children . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.   Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     A.    The Government's Misrepresentation of Material False Testimony,
           Misrepresentation of Key Withheld Evidence, and Improper Vouching Require
           Dismissal of the Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

           1.    The Government Presented False and Misleading Testimony Through a
                Summary Witness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

           2.    The Government Misrepresented the Content of Key Evidence
                That it Withheld From the Grand Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

           3.    The Government Refused to Answer Direct Questions From the Grand
                Jurors Regarding the Location of the Children and Falsely Stated that the
                Information About Their Location was Not Relevant . . . . . . . . . . . . . . . . . 21

4.    The Summary Witness Engaged in Improper Vouching Regarding the Credibility of the Complaining Witness and Materially Misrepresented Her Prior Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

5.    The Government Failed to Remind the Grand Jury that It Had the Authority to Call Percipient Witnesses, Which Was Particularly Important in This Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

B.    The Government Either Knew of the Falsity or Was Deliberately Ignorant, And the Government Cannot Deny that it is Now Aware of the Falsity . . . . . . . . 26

C.    The Court Should Exercise its Limited Supervisory Powers With Respect to Any Future Grand Jury Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

III.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**TABLE OF AUTHORITIES**

**FEDERAL AUTHORITIES**

Bank of Nova Scotia v. United States, 487 U.S. 250 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,16,25

Mesarosh v. United States, 352 U.S. 1 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17,18

Morris v. Ylst, 447 F.3d 735 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Napue v. Illinois, 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Stirone v. United States, 361 U.S. 212 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,3

United States v. Al Mudarris, 695 F.2d 1182 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Basurto, 497 F.2d 781 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Boyd, 55 F.3d 239 (7th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Calandra, 414 U.S. 338 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

United States v. Freeman, 650 F.3d 673 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

United States v. Isgro, 974 F.2d 1091 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Molina, 934 F.2d 1440, 1445 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Roberts, 618 F.2d 530, 533 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Samango, 607 F.2d 877 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Siriprechapong, 181 F.R.D. 416 (N.D. Cal. 1998) . . . . . . . . . . . . . . . . . . . . 17,27

United States v. Williams, 504 U.S. 36 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

**TABLE OF EXHIBITS**

Exhibit A:      Grand Jury Transcript (dated December 19, 2012)

Exhibit B:      Asylum Case Status (dated October 1, 2012)

Exhibit C:      Summary of Asylum Hearing (dated July 3, 2012)

Exhibit D:      Sarani Hernandez Asylum Declaration (dated May 19, 2012)

Exhibit E:      Ibanez 302s

Exhibit F:      Beecher 302s

Exhibit G:      Watsonville Police Report (dated November 27, 2012)

Exhibit H:       Field Operations Worksheet re: Attempt to Locate Enrique Hernandez-Lopez

**PREVIOUSLY SUBMITTED EXHIBITS REFERENCED HEREIN**

(1)      Transcript of Recorded Telephone Call (dated December 3, 2012), Docket #58-1,
         Previously submitted as Exhibit A in support of Salinas Motion For Grand Jury Transcripts

(2)      Translations of Desarrollo Integral de la Familia ("DIF") File, Docket #63,
         Portions previously submitted under seal as Exhibit B in support of Salinas Motion For
         Grand Jury Transcripts

(3)      Police Report made by Patricia Delatorre (dated April 25, 2012), Docket #64-1,
         Previously submitted as Exhibit A in support of Salinas Motion For Bill of Particulars

STEVEN G. KALAR
Federal Public Defender
ROBERT CARLIN
Assistant Federal Public Defender
55 S. Market Street, Suite 820
San Jose, CA  95113
Telephone:  (408) 291-7753
Email: robert_carlin@fd.org

Counsel for Defendant
JESUS SALINAS

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br><br>MARIA GUADALUPE VALENZUELA,<br>PATRICIA DELATORRE,<br>JESUS SALINAS,<br><br>    Defendants.<br>_____ | No. CR-12-00887 EJD<br><br>**DEFENDANT JESUS SALINAS'**<br>**MOTION TO DISMISS INDICTMENT**<br>**DUE TO MATTERS OCCURRING**<br>**BEFORE GRAND JURY, INCLUDING**<br>**MATERIAL FALSE TESTIMONY; FALSE**<br>**DESCRIPTIONS OF KEY WITHHELD**<br>**EVIDENCE; AND VOUCHING**<br><br>Date:   October 21, 2014<br>Time:  9 a.m.<br><br>Honorable Edward J. Davila |

TO: ASSISTANT UNITED STATES ATTORNEYS JEFFREY NEDROW AND JEFFREY
   SCHENK, AND THE CLERK OF THE ABOVE-ENTITLED COURT

   PLEASE TAKE NOTICE that on October 21, 2014, at 9:00 a.m., or as soon thereafter as the

matter may be heard, in the courtroom of the Honorable Edward J. Davila, defendant Jesus Salinas

("Mr. Salinas") will move the Court to dismiss the indictment pursuant to the Fifth Amendment's

requirement of grand jury indictment because the government (1) presented material false testimony

1   to the grand jury; (2) mischaracterized key evidence that it withheld from the grand jury; (3)

2   improperly vouched for the complaining witness's credibility while withholding evidence of her

3   prior statements; and (4) failed to remind the grand jurors of their right to call percipient witnesses.

4   The government's conduct before the grand jury significantly impaired the grand jury's charging

5   function, violated the government's statutory and constitutional obligations before the grand jury,

6   and substantially influenced their determination to indict.   In the event that the Court has questions

7   regarding the government's conduct that are not addressed by the record and argument, the Court

8   should hold an evidentiary hearing.

9       The government has indicated that it may voluntarily return to the grand jury to seek a

10  superseding indictment.  The Court should set a date certain by which the government must make

11  this determination, and at that time, the Court should dismiss the indictment if the government has

12  not acted.  In the event that future grand jury proceedings occur, either due to voluntary action by the

13  government, or as a result of dismissal of the current indictment, Mr. Salinas further requests that the

14  Court exercise its supervisory powers to order the government to present certain documents to the

15  grand jury, specified herein, and allow them sufficient time to review the documents.

16      This motion is based on the instant Memorandum of Points and Authorities, the Federal

17  Rules of Criminal Procedure, the Fifth Amendment, the Constitution of the United States, and on

18  such evidence and argument as will be presented at the hearing.

19                                    **I.**

20                          **<u>INTRODUCTION</u>**

21      A defendant's right to be indicted solely on charges returned by a neutral and independent

22  grand jury is a core requirement of the Fifth Amendment.  As the Supreme Court emphasized over

23  fifty years ago in <u>Stirone v. United States,</u>

24          The very purpose of the requirement that a man be indicted by grand jury is to limit his
            jeopardy to offenses charged by a group of his fellow citizens acting independently of either
25          prosecuting attorney or judge. . . .

26

MOT. TO DISM. DUE TO FALSE TESTIMONY,
WITHHELD EVID. & VOUCHING BEFORE G.J.
No. CR 12-00887 EJD                              2

The right to have the grand jury make the charge on its own judgment is a substantial right which cannot be taken away.

Stirone v. United States, 361 U.S. 212, 218-19 (1960) (footnote omitted), quoted in United States v. Samango, 607 F.2d 877, 884 (9th Cir. 1979).   See also United States v. Calandra, 414 U.S. 338, 343 (1974) (the grand jury's functions "include both the determination whether there is probable cause to believe a crime has been committed and the protection of citizens against unfounded criminal prosecutions").

In this case, the government has voluntarily provided the grand jury testimony, dated December 19, 2012, of Federal Bueau of Investigations ("FBI") Special Agent Christina Chesson, who was the only witness before the grand jury.   See Grand Jury Transcript dated Dec. 19, 2012, separately submitted under seal as Exhibit A.[1]   The transcript demonstrates that the government repeatedly presented false testimony to the grand jury, mischaracterized the content of key evidence that it withheld from the grand jury, improperly vouched for the credibility of the complaining witness while withholding her prior statements, refused to answer direct questions from the grand jury regarding the location of the children and falsely stated that the information was not relevant, and failed to remind the grand jury of its right to call percipient witnesses.  Whether considered in isolation or cumulatively, the government's conduct substantially influenced the grand jury's decision to indict, and rendered the proceedings fundamentally unfair.

While the government has significant latitude in choosing how to present its case to the grand jury, in this case the government's conduct precluded the grand jury from exercising its core function as a "buffer or referee between the government and the people."   United States v. Williams, 504 U.S. 36, 47 (1992).   The government's "behavior . . . degrade[d] the grand jury into a rubber stamp, and the testing of the prosecutor's evidence into an empty ritual."   United States v. Al

_____

[1] The government's voluntary provision of the transcript moots the defendants' pending motion for the transcript, which the Court had taken under submission.

MOT. TO DISM. DUE TO FALSE TESTIMONY,
WITHHELD EVID. & VOUCHING BEFORE G.J.
No. CR 12-00887 EJD                                 3

1  <u>Mudarris</u>, 695 F.2d 1182, 1188 (9th Cir. 1983).   The government significantly impaired the grand

2  jury's ability to exercise its independent judgment, violated statutory and constitutional codes of

3  conduct before the grand jury, and through its actions, substantially influenced the grand jury's

4  decision to indict.  Accordingly, under the Fifth Amendment and the Court's limited supervisory

5  powers, the indictment must be dismissed.

6  **II.**

7  **<u>LIST OF MATERIAL FALSE OR MISLEADING TESTIMONY</u>**

8  Because the material false statements and material misrepresentations in the grand jury

9  transcript are so numerous, Mr. Salinas will list them in the order that they appear in the transcript,

10  followed by an indication of whether the claim is "false," "materially misleading," or "contradicted,"

11  based on other documents and evidence.  Mr. Salinas will then indicate the source document that

12  demonstrates the falsity or contradicts the claim.

13  *          *          *

14  **(1)**     **<u>IMMIGRATION STATUS OF MS. HERNANDEZ</u>:** Before the grand jury, Agent

15  Chesson testified that Ms. Hernandez "is a Mexican citizen.  She's not in the U.S. legally."  Grand

16  Jury Transcript, Exhibit A, at 11.

17  *Status of this Claim:*  **False.**  According to electronic case status records, a final decision

18  granting asylum was made on October 1, 2012, more than two months before the grand jury

19  proceedings.  See "Case Status (SCTA)" re: Sarani Hernandez dated 10/1/12 ("Current Status:

20  Asylum Granted"; "Final Decision: Granted"), Exhibit B.[2]

21  **(2)**     **<u>LOCATION OF CHILDREN</u>:**  The government informed the grand jury that when Ms.

22  Hernandez came to the U.S. in 2011, she left all three children with her mother.  Grand Jury

23  Transcript at 12.

24  _____

25  [2] Other documents in Ms. Hernandez's A-file indicate that after the final decision granting asylum was made on October 1, 2012, the case held was for "headquarters review."  "HQ"

26  concurred with the final decision on an unknown date prior to March 15, 2013.

*Status of this Claim***:   Contradicted** by statements of the children that they were left with her boyfriend's mother, and the older brother was not with them.  <u>See</u> DIF Report, Statement of Minors, dated Dec. 11, 2013, Bates 559, previously submitted under seal, Docket #63:

> When we were about nine and seven years old, our mother and Enrique crossed over illegally into the United States while we stayed at Enrique's mother's house. During that time, [redacted] lived with our maternal grandmother Maria in Zinapecuaro, Michoacan.

**(3)   <u>ALLEGED LACK OF CONNECTION TO SALINAS</u>:**  Before the grand jury, the government claimed that Ms Hernandez said she had no prior connection to Mr. Salinas, stating that her "brother put her in contact with someone that a friend of his knew," who had helped children cross the border before.  Grand Jury Transcript at 13.

*Status of this Claim***:   Contradicted.**  <u>See</u> Summary of Asylum Hearing, Ex. C, at 3 ("I was going to bring them in [J]uly with **a friend from my town**, when he tried to pass them through, they couldn't pass [because] they didn't have a passport . . . .") (emphasis added).

**(4)   <u>DENIAL OF BORDER CROSSING ATTEMPT IN 2012</u>:**  Before the grand jury, the government claimed that there was no record of Mr. Salinas being detained at the border, as he had told Ms. Hernandez.  Grand Jury Transcript at 20

*Status of Claim*:   **False.**   Salinas did attempt to cross the children, as the government now concedes.  <u>See</u> Government Opp. Brief to Salinas Mot. For Bill of Particulars, Docket #87, at 4:8-12:

> [O]n July 3, 2011, [Salinas] attempted to cross the border with the children.   Delatorre also attempted to cross, but she did not accompany Salinas and the children as a group through customs.  Border officials had questions for Salinas about the children, and directed him to the secondary inspection.

**(5)   <u>ALLEGED LACK OF CONSENT</u>:**  Before the grand jury, the government claimed that Ms. Hernandez did not consent to the placement of her children with Ms. Valenzuela, and "insisted" that they be taken to her mother in Michoacan.  Grand Jury Transcript at 15.

*Status of Claim:*   **False.**  Ms. Hernandez asked Ms. Valenzuela to take care of the boys until she could send for them:

> The people helping me get to the United States offered to take care of them until I could send for them.  After I arrived in the United States, they began extorting me for money, threatening to tell the authorities where I was if I did not pay them money every month.

Hernandez Decl., Ex. D, at 3.

The false claim that Ms. Hernandez "insisted" that the children be taken to Michoacan was also contradicted by her statement to the Watsonville Police Department, in which she never claimed to have objected to the child care arrangement.  As Ms. Hernandez told the Watsonville police:

> Albor stated that he would be leaving her children with his mother-in-law; (S2) Maria Guadalupe in Juarez, Mexico.  Hernandez asked Albor if he could take her children back to her mother.  Albor stated that he could not because it was a two day trip by bus, and that he needed to be back in Washington for work.  Albor stated that the children could stay with his mother-in-law until Hernandez was able to find another person to bring her children back to the states, but in the mean time she could send money to his mother-in-law for her children.

Statement of Hernandez to Watsonville Police Department at 7, Exhibit G (hereinafter "Hernandez Police Report").   In a glaring example of impermissible vouching, this report was withheld from the grand jury, while Agent Chesson stated that she had reviewed it, and falsely described it as "very consistent on details, everything," with her statements to the FBI.  Grand Jury Testimony at 35.

**(6)**     **ALLEGED ABSENCE OF CHILDCARE AGREEMENT:**  Before the grand jury, the government claimed that when Ms. Hernandez spoke to Ms. Valenzuela about the children, Ms. Hernandez said that Ms. Valenzuela demanded money, and refused to give the address of children. Grand Jury Transcript at 22-24.

*Status of Claim*:  **False**.  As Ms. Hernandez stated under oath in her asylum declaration, she asked Ms. Valenzuela to take care of the children until she could send for them.  See Hernandez Decl. at 3 (see above).  She agreed to send money each month for their support because she could not afford the higher cost of smuggling them into the United States.  See Hernandez Police Report, Ex. G, at 8 ("Hernandez told me that she is a seasonal field worker and did not have enough money to pay the high prices that other 'coyotes' wanted her to pay for her children to cross the border.  In the mean time every week Hernandez would send 'Guadalupe' $50-$60 a week."); see also Translation of Statement of Maria Guadalupe Valenzuela before the Deputy Attorney General's

Office of Legal and Social Assistance of Bravos Judicial District at 552, Docket #63:

> Later on, the children's mother called me at my house and asked me to take care of them for a week, at the most, because she did not work and did not have money to send them. I did ask her to send [money] for their expenses. The days passed and I was asking what was going to happen with the children. SARANI's brother told me that she was doing all right economically and that she had even bought a car. Time passed and she only sent about $80 each week, which only happened a few times. Later on, we stopped hearing from her because she changed her phone number. She call once in a while and said that she did not have any money to send the children. I used the money that she sent to buy them clothes because when the children stayed at my house they only had one change of clothes. One of them did not even have underwear. On several occasions, I asked Sarani to take the children and she would only tell me that someone would go pick them up soon but never told me who.

**(7)** <u>**ALLEGED DISSUASION FROM CALLING POLICE:**</u>   Before the grand jury, the government claimed that in April 2012, Ms. Hernandez said that Ms. Delatorre attempted to dissuade Ms. Hernandez from calling the police.  Grand Jury Transcript at 29.

*Status of Claim:*  **Contradicted.**  In April 2012, Ms. Delatorre herself called the police, reported that the children were in Mexico, and reported both Ms. Herandez and Enrique for abandoning the children and making death threats against Ms. Delatorre and her family.  <u>See</u> Police Report made by Patricia Delatorre (hereinafter "Delatorre Police Report"), April 25, 2012, at 38, previously submitted as Exhibit A in support of Salinas Mot. For Bill of Particulars, Docket #64-1:

> [Delatorre] had left the two children at her mother's residence in Mexico.  In the beginning Enrique and Sarani had provided some money to De La Torre's mother for taking care of the children in Mexico, however they had stopped providing any money.  De La Torre states that her mother is very poor and she actually has to send her mother money so that she can survive with the children.  Based on the lack of support from Enrique and Sarani she had contacted them letting them know that she needed money for the kids.  Enrique had become quite upset and had called her and basically stated that he was going to come and kill her. . . . [Delatorre] requested any type of information that she could get to assist with the two children in Mexico.

**(8)** <u>**ALLEGED MOTIVE FOR LEAVING WASHINGTON IN 2012:**</u>   The government claimed that Ms. Hernandez said she left Washington State and got rid of her telephone because she was afraid of Patty and afraid of being located by immigration.  Grand Jury Transcript at 30.  The government also claimed that immigration agents came looking for Ms. Hernandez right after she left Washington because Patty had called immigration.  <u>Id</u>. at 31.

*Status of Claim:* **False and materially misleading.**   This testimony was false and misleading in two ways.  First, Ms. Hernandez did in fact flee Washington to avoid law enforcement.  However, the reason she came to the attention of law enforcement, and the reason she and Enrique wanted to flee, was because Ms. Delatorre had reported her for abandoning her children, and had reported Enrique for making death threats.  See Delatorre Police Report at 2, Docket #64-1 (stating that officer attempted to reach Ms. Hernandez and Enrique on or about April 25, 2012, regarding abandonment and death threats, but was unsuccessful).

The second false aspect of the grand jury testimony was the government's claim that immigration authorities came looking for Ms. Hernandez after she fled, "[j]ust as Patty had told them."  Grand Jury Transcript at 31.  It is correct that immigration agents came to the residence on May 9, 2012, roughly two weeks after Ms. Delatorre's police report.  However, immigration authorities were looking for her boyfriend, Enrique, and not Ms. Hernandez.  He had illegally reentered the United States after a prior deportation, and was known to have three prior convictions, including assault, battery, and drug possession.  See Field Operations Worksheet re: Attempt to Locate Enrique Hernandez-Lopez (dated May 9, 2012), Exhibit H, at Bates 2532-2533 (stating that Enrique and his "spouse/girlfriend" had "left in a hurry" approximately a week to two weeks earlier).  Based on the timing of their flight from Washington, they appear to have left the state almost immediately after law enforcement attempted to contact them about the child abandonment and death threats.

**(9)**    **REASON FOR TERMINATION OF COMMUNICATION:**   Before the grand jury, the government claimed that communication was terminated between Ms. Hernandez and the children because, according to Ms. Hernandez, Ms. Valenzuela would not allow Ms. Hernandez to continue speaking to the boys after she requested location information.  Grand Jury Transcript at 30-31.

*Status of Claim:* **False.**  Ms. Hernandez chose to terminate communications with Maria and the boys after refusing to continue to send money for their support, stating, "I don't care what you do

with them, take them to DIF or leave them at the bridge."   See Transcript of Recorded Call at 114-15, previously submitted at Docket #58-1 (Statement of Ms. Valenzuela to Ms. Hernandez: "You have known– you told me, 'I don't want anything.  Give them to DIF, give them to whomever, I don't want anything!'  You said that yourself."); DIF Reports at 552 ("She told me if I wanted to I could turn them over to DIF or the bridge."); Translation of Letter of Aidee Arellanes Garcia, Social Services Chief at 556:

> When the minors were interviewed, they stated that they have lived with Ms. Maria Guadalupe Valenzuela Castaneda at the [redacted] address in the Francisco Sarabia neighborhood for the past two years because their biological mother named Sarani Hernandez Ramirez, 34 years of age, abandoned them with her since then and left to the United States.
> . . .  They then stated that their mother called some time ago and said that she did not want them anymore, that she could keep them or do whatever she wanted with them, which is why they are with her.

**(10)**   **ALLEGED CONCERN ABOUT IMMIGRATION CONSEQUENCES:**   Before the grand jury, the government described a meeting that occurred in Washington State in September 2012 between Elizabeth Ibanez, a social worker, Josefina Beecher, a pastor, and Ms. Delatorre, and Mr. Salinas.  The government claimed that after that meeting, neither the social worker nor the pastor made any report to law enforcement regarding a potential international kidnapping of the two minor children because they were concerned about an adverse immigration consequence to Ms. Hernandez because she was out of status.  Grand Jury Transcript at 33.

*Status of Claim:*  **Contradicted**.  Ms. Ibanez was aware at the time of the meeting that Ms. Hernandez had already disclosed her illegal status to authorities.  Four months before the visit, in May, 2012, Ms. Ibanez had assisted Ms. Hernandez in filling out her asylum application and writing her declaration under oath, in which she disclosed her illegal status.  See Summary of Asylum Hearing, Ex. C, at 1-5.

**(11)**   **ALLEGED REFUSAL TO RETURN CHILDREN:** Before the grand jury, the government claimed that during the September 2012 meeting, Ms. Delatorre and Mr. Salinas:

both told the social worker that they were not going to return the children to Sarani, and they were not going to give Sarani the address where her children were being held, and they wanted more money from Sarani. And she wasn't going to get her children back until Sarani paid.

Grand Jury Transcript at 32.

*Status of Claim:* **Materially misleading and uncorroborated.** In her testimony, Agent Chesson summarized her own FBI 302 regarding her interview with Ms. Ibanez, which had occurred on December 10, 2012 (hereinafter "Chesson/Ibanez 302"), Exhibit E-1. As of December 19, 2012, she had not interviewed Pastor Beecher. However, neither the Chesson/Ibanez 302 nor Agent Chesson's summary of the interview before the grand jury are consistent with two interviews on the same topic conducted by her colleague, FBI Agent Neil Rogers.

Agent Rogers interviewed Ms. Ibanez on December 19, 2012 (hereinafter "Rogers/Ibanez 302"), Exhibit E-2, and he interviewed Pastor Beecher on December 21, 2012 (hereinafter "Beecher 302"), Exhibit F. The 302s prepared by Neil Rogers do not support key assertions made by Agent Chesson. In the Rogers/Ibanez 302, Ms. Ibanez states:

> [m]ost of the talking was done by Beecher and Delatorre. . . . Salinas-Albor was looking down for 'quite a bit' of the meeting. . . . They asked them to provide information regarding the children. Salinas-Albor and Delatorre told a story about how Hernandez owed them money, and they were doing her a favor after border patrol stopped her children . . . . They pointed to the clothing stacked on the couch and said the clothing was for her children, and Hernandez needed to pay them for the clothing and other moneys owed to them. When Beecher asked about providing information about the children, they stated, "not until she pays us."

Rogers/Ibanez 302 at 2-3, Ex. E-2, Bates 435-36. Contrary to the summary provided in the grand jury testimony and the 302 prepared by Agent Chesson, Ms. Ibanez did not report any statement to Agent Rogers "that they were not going to return the children to Sarani," nor did she report any statement that "she wasn't going to get her children back until Sarani paid." Moreover, in the Beecher 302 prepared by Agent Rogers, neither Ms. Delatorre nor Mr. Salinas ever stated that they were not going to return the children, or that she wasn't going to get the children back until she paid. Pastor Beecher emphasized during her interview that:

the purpose of the visit was two-fold.  The first reason was to express concern over the children and ascertain their condition.  The second reason was to obtain a telephone number where the children could be contacted by their mother.

Beecher 302 at 2, Ex. F, Bates 333.   Ms. Delatorre addressed both of these purposes – she shared photographs and videos of the children, and she provided a telephone number.  Id.  Pastor Beecher did not make any demand for the return of the children, and there is no evidence in the 302 that the children were being physically withheld from the mother, nor does it state that the children were being withheld until money was paid.

**(12)**   **CONTENT OF RECORDED CALL:**  Agent Chesson claimed that during a monitored phone call, Ms. Hernandez asked for the children back, and Ms. Valenzuela refused and stated that Ms. Hernandez owed her money.  GJT at 35-36.  (See next section for further discussion.)

*Status of Claim:*  **False and materially misleading.**  Ms. Valenzuela stated, "I am not charging you for anything," "this is not a kidnapping,"  that Maria had been paying for their care without any assistance from Sarani for many months; that the children were right where Sarani had left them; that Sarani had verbally abandoned the children during a prior phone call, which the children and others had overheard; and that the children were in school and DIF had become involved, so it was "not that easy" for Ms. Hernandez to suddenly get the children back.  See Transcript of Recorded Call, Docket #58-1 (excerpted in next section).

**(13)**   **STATUS OF CHILDREN:**  Before the grand jury, the government claimed that it was important that one of the children spoke to their mother during the recorded phone call, because this confirmed "that this in fact was a potential kidnapping."  Grand Jury Transcript at 37.

*Status of Claim:* **False and materially misleading.**  The child did not say anything whatsoever that confirmed "that this in fact was a potential kidnapping."  To the contrary, the child told his mother that she had abandoned them, that she had not sent enough money, and that they were happy with Maria and did not want to go back to their mother.  See  Transcript of Call at 116-121.

**(14)** <u>**LOCATION OF CHILDREN:**</u>  Before the grand jury, the government claimed that law enforcement found the children "around the corner at a school playing."  Grand Jury Transcript at 38.

*Status of Claim:*  **False and materially misleading.**  The children were enrolled at the school, and were taken from the school while school was in session.  Maria Guadalupe Castañeda Valenzuela ("Maria Castañeda or Ms. Castañeda ").  had personally enrolled the children in the school after obtaining special permission:

> Maria Guadalupe Valenzuela Castaneda appeared at the beginning of the 2012-13 school year with the children, [redacted], stating that the children's mother had left them in her care, that it had already been a long time since they had attend school, and that she wanted them to enroll.  She then presented two copies of their birth certificates and even though this was insufficient, since they had no grades to present, the corresponding steps were followed and they were accepted.  Their teachers have stated that they would always show up well groomed, with their school supplies and in their uniform.

Translation of Letter of Director of Lazaro Cardenas Elementary School, Jose Guadalupe Hernandez, DIF Reports, Docket #63, at 589.

**III.**

<u>**ARGUMENT**</u>

**A.** **THE GOVERNMENT'S PRESENTATION OF MATERIAL FALSE TESTIMONY, MISREPRESENTATION OF KEY WITHHELD DOCUMENTS, AND IMPROPER VOUCHING REQUIRE DISMISSAL OF THE INDICTMENT**

       **1.** **The Government Presented False and Misleading Testimony That Was Essential to the Grand Jury's Findings**

The district court's authority to dismiss an indictment as a result of matters occurring before the grand jury derives from two separate sources.  <u>See</u> <u>United States v. Isgro</u>, 974 F.2d 1091, 1094 (9th Cir. 1992).  First, the court may dismiss the indictment due to constitutional error in cases where the independence of the grand jury was substantially infringed, or where the proceedings were rendered fundamentally unfair.  <u>Id</u>.  Pursuant to this authority, knowing reliance on perjured testimony, either before or after return of the indictment, constitutes a violation of the Due Process Clause and requires dismissal where the testimony is material and jeopardy has not attached.  <u>See</u>

United States v. Basurto, 497 F.2d 781, 785 (9th Cir. 1974) ("the Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached").

Second, the court may dismiss the indictment pursuant to its supervisory power in cases where the government's improper conduct undermined the integrity of the grand jury's functions, or where the conduct violated established standards of behavior for prosecutors, and where the conduct substantially influenced the grand jury's decision to indict.  See Isgro, 974 F.2d at 1094.  Examples of improper conduct that would justify dismissal of the indictment pursuant to the supervisory power include conduct that undermines the integrity of the grand jury's functions, or conduct that violates certain "standards of behavior for prosecutors . . . set forth in the United States Code," such as presentation of false testimony or false declarations before the grand jury, in violation of 18 U.S.C. § 1623, or subornation of perjury, in violation of 18 U.S.C. § 1622.  See United States v. Williams, 504 U.S. 36, 46 & n.6 (1992); see also Samango, 607 F.2d at 881 (dismissing indictment pursuant to supervisory power where prosecutor repeatedly overreached independence of grand jury).

Where the government engages in such conduct, dismissal is warranted if the defendant demonstrates prejudice, defined by the Supreme Court as conduct that "substantially influenced the grand jury's decision to indict,'" or that creates "'grave doubt' that the decision to indict was free from the substantial influence of such violations."[3]   United States v. Bank of Nova Scotia, 487 U.S. 250, 256 (1988).  "The prejudicial inquiry must focus on whether any violations had an effect on the grand jury's decision to indict."Id. at 261, 263 (finding dismissal unwarranted where there was no

---

[3] In cases where the defendant is not prejudiced by the misconduct, or where the misconduct violates a prosecutor's ethical duties but does not justify dismissal of the indictment, the court may consider lesser sanctions than dismissal, including punishment as "contempt of court, . . . [directing] a prosecutor to show cause why he should not be disciplined[,] and request[ing] the bar or the Department of Justice to initiate disciplinary proceedings against him.  The court may also chastise the prosecutor in a published opinion.'"  Isgro, 974 F.2d at 1099 (quoting Bank of Nova Scotia, 487 U.S. at 263).

1    evidence that misconduct "substantially affected the grand jury's evaluation of the testimony or its

2    decision to indict"); see also Isgro, 974 F.2d at 1097 ("a court should not use its supervisory powers

3    to mete out punishment absent prejudice to a defendant").  Additionally, the court's analysis of

4    prejudice must be limited "to those events that actually bear upon the grand jury's decision to

5    indict," and may not include consideration of post-indictment misconduct.  See Isgro, 974 F.2d at

6    1097 ("In deciding whether to dismiss an indictment, a court must not only determine whether a

7    defendant has suffered actual prejudice, it must also limit its consideration to those events that

8    actually bear upon the grand jury's decision to indict.").[4]

9            While the Supreme Court held in Williams that dismissal is not appropriate where the

10   government fails to present exculpatory material to the grand  jury, dismissal is warranted when a

11   prosecutor knowingly presents material false testimony to the grand jury, and where the false

12   testimony substantially influenced the grand jury's decision to indict.  See Williams, 504 U.S. at 46

13   & n.6, 52.  Dismissal may be required even if the prosecutor's conduct is not intentional.  See Isgro,

14   974 F.2d 1094 n.3 ("'Although deliberate introduction of perjured testimony is perhaps the most

15   flagrant example of misconduct, other prosecutorial behavior, even if unintentional, can also cause

16   improper influence and usurpation of the grand jury's role.'") (quoting Samango, 607 F.2d at

17   882); see also Al Mudarris, 695 F.2d at 1188 ("even unintentional misconduct can cause improper

18   influence and usurpation of the grand jury's role").  Additionally, the Ninth Circuit has noted that

19   the prosecutor has an ethical duty to present evidence to the grand jury that "casts serious doubts on

20   the credibility of testimony which the jurors are asked to rely upon in finding an indictment."  See

21   Samango, 607 F.2d at 882 n.8 (citation and quotation marks omitted).

22           In Samango, the Ninth Circuit found that dismissal of the indictment pursuant to the court's

23   _____

24       [4] Because the time frame for purposes of this motion under Williams and Isgro must be
     limited to matters that occurred prior to indictment, Mr. Salinas has not identified other portions of
25   the grand jury testimony that he believes to be false in light of subsequent defense investigation, and
     will instead present these arguments in separate motions regarding efforts of the complaining
26   witness to suborn perjury.

1   supervisory power was warranted based on the cumulative impact of the prosecutor's conduct, which

2   included presentation of a prior transcript of a witness for the sole purpose of engendering prejudice;

3   failing to warn the grand jury regarding a key witness' doubtful credibility; and presenting other

4   transcripts that the jury was not given sufficient time to review.   <u>Samango</u>, 607 F.2d at 881, 885.

5   The <u>Samango</u> court found that "[t]he cumulative effect of the above errors and indiscretions, none of

6   which alone might have been enough to tip the scales, operated to the defendants' prejudice by

7   producing a biased grand jury." <u>Id</u>. at 884.

8        Even if the prosecutor is not aware at the time of the grand jury proceedings that the

9   testimony was false, the prosecutor's subsequent knowledge is sufficient to justify dismissal of the

10  indictment, as long as jeopardy has not attached.  <u>See</u> <u>Basurto</u>, 497 F.2d at 785; <u>see</u> <u>also</u> <u>Morris v.</u>

11  <u>Ylst</u>, 447 F.3d 735, 743 (9th Cir. 2006) (stating in context of perjury at trial, "a prosecutor must

12  correct false evidence whenever it appears") (citing <u>Napue v. Illinois</u>, 360 U.S. 264 (1959)); <u>United</u>

13  <u>States v. Price</u>, 566 F.3d 900, 910 n. 11 (9th Cir. 2009) ("'When a prosecutor suspects perjury, the

14  prosecutor must at least investigate'" further, consistent with his "'duty to correct what he knows [or

15  suspects] to be false and elicit the truth.'") (quoting <u>Morris v. Ylst</u>).

16       In <u>Basurto</u>, the Ninth Circuit found that dismissal of the indictment pursuant to the Due

17  Process Clause was warranted because the prosecutor learned prior to trial that a witness had lied

18  before the grand jury as to a material issue.  <u>See</u> <u>Basurto</u>, 497 F.2d at 785 (stating that prosecutor has

19  an essential duty "not to permit a person to stand trial when he knows that perjury permeates the

20  indictment").

21       As the Ninth Circuit summarized the legal basis for its holding in <u>Basurto</u>:

22       The [Supreme] Court held in <u>Napue</u> that the prosecution's use of known false testimony at
         trial required a reversal of the petitioner's conviction. The same result must obtain when the
23       government allows a defendant to stand trial on an indictment which it knows to be based in
         part upon perjured testimony. The consequences to the defendant of perjured testimony given
24       before the grand jury are no less severe than those of perjured testimony given at trial, and in
         fact may be more severe. The defendant has no effective means of cross-examining or
25       rebutting perjured testimony given before the grand jury, as he might in court.

26

MOT. TO DISM. DUE TO FALSE TESTIMONY,
WITHHELD EVID. & VOUCHING BEFORE G.J.
No. CR 12-00887 EJD                          15

1    Basurto, 497 F.2d at 786 (citing Napue).[5]

2          In Isgro, the Ninth Circuit distinguished both Samango and Basurto on factual grounds, and

3    reversed the district court's dismissal of the indictment on two grounds, neither of which are

4    applicable here:  first, the Ninth Circuit found that the defendants had failed to show prejudice as

5    defined by Bank of Nova Scotia, in that their sole argument was that they would be prejudiced by a

6    reinstatement of the indictment "because they revealed trial strategy to the government during

7    pretrial proceedings."  Isgro, 974 F.2d at 1098 & n.7.  The Ninth Circuit flatly rejected the argument,

8    holding that "prejudice of that sort cannot be said to have 'substantially influenced the grand jury's

9    decision to indict' and therefore does not fall within the meaning of 'prejudice' as set out in Bank of

10   Nova Scotia."  Id.  Second, the Ninth Circuit found that the district court had erroneously considered

11   prosecutorial misconduct occurring both before and after return of the indictment, including a Brady

12   violation, rather than confining its analysis to matters occurring before the ground jury.  Id. at 1097

13   (stating that court considering dismissal due to misconduct before the grand jury must "limit its

14   consideration to those events that actually bear upon the grand jury's decision to indict") (emphasis

15   in original).   The Isgro court found Samango and Basurto distinguishable on both grounds.  Id. 974

16   F.2d at 1098 n.6 (stating that "in both those cases, dismissal was based on misconduct confined to

17   the grand jury proceeding and that improperly influenced the grand jury's decision to return an

18   indictment").

19         In this case, unlike Isgro, dismissal is required because the government knew that material

20   false testimony was presented to the grand jury, Basurto, 497 F.2d at 785; the government withheld

21   evidence that cast serious doubt on material testimony,  Samango, 607 F.2d at 881-85; and the

22   ───────────────

23         [5] See also United States v. Freeman, 650 F.3d 673, 680 (7th Cir. 2011) ("Napue does not
     require that the witness could be successfully prosecuted for perjury. United States v. Boyd, 55 F.3d
24   239, 243 (7th Cir. 1995). In this area of the law, the governing principle is simply that the prosecutor
     may not knowingly use false testimony. This includes 'half-truths' and vague statements that could
25   be true in a limited, literal sense but give a false impression to the jury. Id. ('It is enough that the jury
     was likely to understand the witness to have said something that was, as the prosecution knew,
26   false.').").

1   conduct substantially influenced the grand jury's decision to indict.  <u>Bank of Nova Scotia</u>, 487 U.S.

2   at 256.   Moreover, even if the government was not aware at the time of the grand jury proceedings

3   regarding the extent of the complaining witness' mendacity, the government's post-indictment

4   knowledge is sufficient under <u>Basurto</u> to require dismissal.[6]  Accordingly, dismissal is warranted

5   both under the Fifth Amendment and pursuant to the Court's limited supervisory powers.

6       As the Court is now well aware, the charges in this case are predicated almost entirely on the

7   claims of one person, Sarani Hernandez, who contends that the defendants kept her children without

8   her permission, and then made various threats and/or demands for money in exchange for return of

9   the children.  The government's presentation before the grand jury was largely based on hearsay

10  testimony offered through a summary witness, the vast majority of which has been demonstrated to

11  be false or materially misleading in light of other evidence available to the government at the time of

12  the grand jury proceedings, including the key facts that she actually consented to placement of the

13  children with Ms. Valenzuela, and later verbally abandoned them to her care.  <u>See</u> Hernandez Decl.,

14  Ex. D, at 3; Transcript of Recorded Call, Docket #58-1, at 114-15, 120.

15      With respect to matters that could have been independently evaluated by the grand jury, the

16  government engaged in a pervasive pattern of withholding relevant documents and instead providing

17  materially false information about their content, including (1) false testimony about Ms.

18  Hernandez's immigration status; (2) false testimony about the consistency of her prior statements to

19  Watsonville police, and (3) false and misleading testimony about the content of the recorded

20  telephone call.   The government also refused to answer direct questions from the grand jury about

21  the location of the children at the time of their proceedings, falsely stating that the information was

22  _____

23      [6]  If the Court has any question about the extent of the government's knowledge, the Court
    should hold an evidentiary hearing and should order discovery regarding the extent of the
    government's investigation and knowledge of falsity, both both pre- and post-indictment.  <u>See</u>, <u>e.g.</u>,
24  <u>United States v. Siriprechapong</u>, 181 F.R.D. 416, 430-35 (N.D. Cal. 1998) (adopting
    recommendation of magistrate and ordering government to disclose various categories of discover
25  regarding its investigation, where government witness who testified before grand jury was later
    found to have engaged in improprieties during investigation).
26

not relevant.

Through her mendacity, Ms. Hernandez "has poisoned the water in this reservoir, and the reservoir cannot be cleansed without draining it of all impurity." Mesarosh v. United States, 352 U.S. 1 (1956). Additionally, the government's summary witness gave material false testimony regarding withheld evidence that the grand jury should have been permitted to independently review. Accordingly, this Court's "[f]astidious regard for the administration of justice" requires dismissal of the indictment and new grand jury proceedings "drain[ed] of all impurity." Id.

### 2. The Government Misrepresented the Content of Key Evidence That it Withheld From the Grand Jury

While the government has no duty to present exculpatory material, neither can the government materially misrepresent key evidence that it withholds. See Williams, 504 U.S. at 46 & n.6 (observing that knowing presentation of false testimony before grand jury and subornation of perjury are grounds for dismissal of indictment).

Here, the government not only withheld key materials that it described to the grand jury, but the government actually misrepresented the content of those materials. Specifically, the government (1) misrepresented and withheld from the grand jury any transcript or recording of the telephone call between Sarani Hernandez and Maria Castañeda  that occurred on December 3, 2012; (2) did not provide the grand jury with any information regarding the DIF investigation and falsely denied the relevance of the children's location; and (3) withheld the Watsonville Police Report while misrepresenting its content by falsely vouching for Ms. Hernandez's credibility.

First, the government provided a materially misleading summary of the December 3 telephone call, and did not provide the grand jury with any direct evidence of the call. The limited information that Agent Chesson provided about the call was the following summary: "Maria said, 'you owe me money, and you need to send me the money.' . . . And Maria said that she would have to talk this over with her husband, and she would let her know how much this time." Grand Jury Transcript at 36-37.

As will be outlined below, Agent Chesson's terse summary of the call was clearly inaccurate. Moreover, the entirety of the telephone call actually contradicts numerous other allegations in Agent Chesson's testimony, thereby reinforcing the conclusion that the government purposefully withheld direct evidence of the call.   For example, as outlined above, Agent Chesson testified that (1) the defendants or their associates made threats to Ms. Hernandez to discourage her from obtaining the children; (2) Maria Castañeda  ceased communication with Ms. Hernandez in July 2012 because Ms. Hernandez sought to obtain location information; (3) Ms. Castañeda demanded more money from Ms. Hernandez in exchange for the return of the children; and (4) the fact that one of the children spoke on the phone "confirmed" that this was a "potential kidnapping."

All of these allegations are belied, either directly or indirectly, by the recording of the call. During that call, Ms. Hernandez was repeatedly confronted by Maria Castañeda  regarding the fact that **Ms. Hernandez** had ceased communication with the children, apparently because she did not want to continue sending money for their support and maintenance, and because she did not want to retrieve them.  Ms. Castañeda  also told Ms. Hernandez that she should speak with DIF about trying to regain custody of the children, and, significantly, that Ms. Castañeda  was "not charging [Ms. Hernandez] for anything":

| | |
|---|---|
| SHR:[7] | I have been striving the whole time to get the children back.  I have looked for ways to get the children back. |
| MCV: | What do you mean the whole time, if they have been here all that time? |
| SHR: | Not the whole time– |
| MCV: | **You have known– you told me, "I don't want anything.  Give them to DIF, give them to whomever, I don't want anything!"  You said that yourself.** |
| SHR: | Well, just tell me where they are so I can go pick them up.  And I will bring you the money then, just tell me how much you want. |
| MCV: | No, no, no; you just send it.  Listen, it's not that easy. . . |

---

[7] SHR = Sarani Hernandez; MCV = Maria Castañeda Valenzuela.

1      . . .

2    MCV:      Give me a call so you can work things out with DIF, or I don't know, you can talk to DIF yourself.

3      . . .

4    MCV:      No, no, the thing is that **I'm not keeping them here kidnapped or anything like that. Your kids are here, they are just here where you left them.**

5      . . .

6    MCV:      The thing is that I don't – I don't – . . . it's not that I am asking you for money, but I have spent a lot on them; but **I am not charging you for**

7            **anything.** The DIF only helped me so that they could stay and go to school.

8 Transcript of Recorded Call, prev. submitted as Ex. A, Docket #58-1, at 114-115 (emphasis added).

9      Ms. Hernandez's son then got on the phone and told his mother that he had previously

10 overheard her tell Maria Castañeda that she didn't want the children. See id. at 116. He told his

11 mother that they wanted to stay with Maria Castañeda , and stated that she did not want any money,

12 telling his mother, "Right here, all she does here is treat us well, she feeds us, and . . . she buys us

13 [UI], she buys us clothes, everything." Id. 119.

14      Ms. Hernandez then asked Maria Castañeda , "how much money do you want me to send

15 you, because I want the children back. What do you want me to do?" The following exchange then

16 occurred:

17    MCV:      You talk to them. The thing is that one day you say one thing and – and you did – You – everybody heard it, look, there were people there listening, I am

18            not the only one who heard it, we all heard what you said, that you didn't – that you didn't want any problems and to leave them wherever. So then [UI].

19    SHR:      No, I told you that I didn't want– that if you didn't want any problems to give

20            me the children back. I [UI] uh –

21    MCV:      No! [UI] don't be such a flake, geez! Don't be that way! Admit what you do! They heard it clearly; it was out loud, [UI]–

22 Id. at 120.

23      Ms. Hernandez then spoke with her son again, and asked whether he was aware that she had

24 previously sent money for them, but her son responds, "Yes, you were sending [money] but the thing

25 is that it was too little, we were not eating, we couldn't eat on that. Because look, we didn't have

26

shoes, we didn't have clothing . . . she–she was buying us clothes, she was feeding us, that [money] was not enough." Id. at 121.

During the call, Ms. Hernandez made a weak attempt to recast her verbal abandonment of her children in a better light, but was quickly challenged by Ms. Castañeda , and then dropped the effort. Id. at 120 (SHR: "No, I told you that I didn't want– that if you didn't want any problems to give me the children back. I [UI] uh –".  MCV: "No! [UI] don't be such a flake, geez!  Don't be that way! Admit what you do! They heard it clearly; it was out loud, [UI]– .").  Moreover, she never expressed any fear of Maria Castañeda  or any other person associated with the defendants, and never mentioned any "threats" purportedly made by Maria Castañeda  or any other person, all in direct contradiction of the government's false description of the call.  Similarly, the child's statements during the call, in which he states that his mother had abandoned them (which she did not deny) and that he did not want to return to her, fly in the face of the government's blatant misrepresentation to the grand jury that it was important to hear from the child during the call "to verify that this was a potential kidnapping."  GJT at 37.  Most importantly, the call demonstrates that Ms. Hernandez had purposefully relinquished the children to Maria Castañeda .  Indeed, Ms. Hernandez's own son repeatedly told his mother that he didn't want to go back with her because he had heard her say that she didn't want the children.

The call also directly contradicts the claim that any ransom demand was made during the call, because Maria Castañeda  clearly stated, "I am not charging you for anything."  Id. at 114-115 (emphasis added).  The government's misrepresentation of the call constituted a material false declaration before the grand jury, in violation of 18 U.S.C. § 1623.  That violation, coupled with the government's withholding of the actual transcript and recording, violated the Fifth Amendment and the government's obligations before the grand jury, and requires dismissal of the indictment.

**3.    The Government Refused to Answer Direct Questions From the Grand Jurors Regarding the Location of the Children and Falsely Stated that the Information About Their Location was Not Relevant**

1    The government did not provide the grand jury with any information regarding the DIF

2    investigation, or even disclose the fact that the DIF investigation was underway.  While the

3    government has no obligation to disclose exculpatory evidence, neither can the government

4    materially misrepresent the existence of such evidence or refuse to answer relevant questions from

5    the grand jury.

6    At the conclusion of testimony by the summary witness, several grand jurors asked questions

7    regarding the location of the children, including whether they were with their mother, see Grand Jury

8    Transcript at 41, and whether they were back in the United States.  See id. at 43.   The government

9    refused to answer either question, stating "it's not relevant for your decision here."  Id. 43.

10   In fact, the information about the children's location was directly relevant, and the

11   government withheld it precisely because a truthful response would have seriously undermined the

12   government's theory of prosecution.  As the government knew, the children could not be returned to

13   their mother in light of their allegations of abandonment by their mother, and physical abuse by she

14   and her boyfriend, Enrique.  Instead, they were living in a shelter in Mexico while DIF conducted its

15   investigation regarding her abandonment, whether a kidnapping had occurred, and the appropriate

16   placement for the children.   Indeed, subsequent to the return of the indictment, DIF prepared a

17   report in which DIF stated its conclusion that the children had been abandoned by their mother and

18   should not be returned to her.[8]

19   Accordingly, the information known to the government about the children's location was

20   clearly relevant.  If the government had truthfully stated that the children were living in a shelter in

21   Mexico, the grand jurors would have wanted to know why they had not been reunited with their

22   mother, and a truthful response to that question would have been devastating to the government's

23

24   [8] In light of the government's non-disclosure of this document, Mr. Salinas has requested that the Court order the government to submit, ex parte, a log of all documents not yet disclosed to the defense.   See Salinas Status Report re: Pretrial Issues and Request for Case Management Order, Docket #91.  Mr. Salinas reiterates that request.

25

26

MOT. TO DISM. DUE TO FALSE TESTIMONY,
WITHHELD EVID. & VOUCHING BEFORE G.J.
No. CR 12-00887 EJD                                22

case.   The government's refusal to respond, coupled with the government's false statement that the information was not relevant, misled the jurors regarding the significance of the information, and precluded the grand jurors from exercising their independent judgment regarding an issue that they specifically and correctly considered to be relevant.

**4.      The Summary Witness Engaged in Improper Vouching Regarding the Credibility of the Complaining Witness and Materially Misrepresented Her Prior Statements**

"It is improper for the prosecution to vouch for the credibility of a government witness. Vouching may occur in two ways:  the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony."  United States v. Roberts, 618 F.2d 530, 533 (9th Cir. 1980) (reversing conviction where prosecutor referred to evidence not in the record to support witness's credibility and where witness's testimony was crucial to case).  "Vouching is especially problematic in cases where the credibility of the witnesses is crucial."  United States v. Molina, 934 F.2d 1440, 1445 (9th Cir. 1991).

In response to government questioning before the grand jury, Agent Chesson improperly vouched for the credibility of the complaining witness and materially mischaracterized the content of her prior statements to the Watsonville Police Department, which were not provided to the grand jury.  Specifically, during questioning, Agent Chesson was asked whether Ms. Hernandez's interview with the FBI was consistent with the interview that she had given to the Watsonville Police Department approximately a week earlier.  Grand Jury Transcript at 35.  In response, Agent Chesson stated that Ms. Hernandez's statement to the FBI was "very consistent on details, everything," with the interview that she had given to the Watsonville Police Department a week earlier.  Grand Jury Transcript at 35.

This assertion constituted improper vouching, and was materially misleading, because Ms. Hernandez's statement to the FBI was materially different from her prior statement to the Watsonville Police Department on several important points.  As just one key example, on the central

issue of whether Ms. Hernandez had either consented or objected to the initial placement of her

children with Ms. Castañeda , the following colloquy occurred before the grand jury:

> Q: After Salinas told Sarani that her children were being sent to Maria Guadalupe, did Sarani ask Salinas if he could take the children back to the grandmother's house?
>
> A: Yeah.  She insisted that he return the children to her mother.  And he refused.
>
> Q: Why did he refuse?
>
> A: He just said no.  He said that he had to get back to the U.S. and that the children were going to be at this home in Juarez.  And that was it.

Grand Jury Transcript at 20-21.   This testimony was central to the government's kidnapping and

hostage-taking theory, because it was the key evidence presented to the grand jury to support the

claim that Ms. Hernandez did not consent to the placement of the children with Ms. Castañeda .

In fact, this testimony was directly contradicted by two prior statements made by Ms.

Hernandez.  As noted earlier, Ms. Hernandez previously stated under oath that she accepted an

"offer" to leave the children with Ms. Castañeda  until she could make further arrangements.

Hernandez Decl. at 3.   She made no claim that the placement was without her consent, and indeed,

her statements under oath demonstrated that she agreed to the placement.

Her statements to the Watsonville Police were consistent with her asylum application,

although she conveniently failed to inform the police regarding the offer-and-acceptance

arrangement.   According to her statement to the police,

> Albor stated that he would be leaving her children with his mother-in-law; (S2) Maria Guadalupe in Juarez, Mexico.  Hernandez asked Albor if he could take her children back to her mother.  Albor stated that he could not because it was a two day trip by bus, and that he needed to be back in Washington for work.  Albor stated that the children could stay with his mother-in-law until Hernandez was able to find another person to bring her children back to the states, but in the mean time she could send money to his mother-in-law for her children.

Statement of Hernandez to Watsonville Police Department at 7, Exhibit G (hereinafter "Hernandez

Police Report").  She never told the police that she had objected to their placement with Ms.

Castañeda ; she never "insisted" that they be taken to her mother; and Mr. Salinas never said or

implied "that was it."   Compare Grand Jury Transcript at 20-21 with Hernandez Police Report at 7.

Ms. Hernandez's statement to the police plainly fails to support the government's kidnapping and hostage-taking theory.  Far from "kidnapping" the children or taking them "hostage," Mr. Salinas simply stated "that the children could stay with his mother-in-law until Hernandez was able to find another person to bring her children back to the states," and that Ms. Hernandez could send money for their support in the meantime.  Hernandez Police Report at 7, and in Ms. Hernandez's own declaration under oath, she stated that she agreed to this proposal.   Hernandez Decl. at 3.  There was no sinister motive – Mr. Salinas simply could not afford to spend four days taking buses back and forth to Michoacan, and Ms. Hernandez never objected to the alternative arrangements to leave the children with Ms. Castañeda  until she could make other arrangements.  Id.

Before the grand jury, Agent Chesson claimed under penalty of perjury that Ms. Hernandez's statements to the Watsonville Police Department were "very consistent on details, everything," with her statements to the FBI.  Grand Jury Transcript at 35.  This claim was materially false, as outlined above.  The government also withheld the police report from the grand jury, thereby precluding them from conducting their own independent comparison.   Agent Chesson's improper vouching and materially false description of the police report usurped the grand jury's independence and constituted a material false declaration before the grand jury, in violation of 18 U.S.C. § 1623.  The clear materiality of this testimony demonstrates that it substantially influenced the grand jury's decision to indict, warranting dismissal of the indictment under the Fifth Amendment and the Court's supervisory powers.  See Bank of Nova Scotia, 487 U.S. at 256; Williams, 504 U.S. at 46 & n.6; Roberts, 618 F.2d at 533.

### 5.    The Government Failed to Remind the Grand Jury that It Had the Authority to Call Percipient Witnesses, Which Was Particularly Important in This Case

While the government is permitted to rely solely on hearsay during grand jury proceedings, the grand jury is nonetheless "entitled to hear live testimony of percipient witnesses."  Al Mudarris, 695 F.2d at 1187.  Although grand jurors are advised of that right during their orientation, the Ninth Circuit has admonished that the government should "remind the grand jury that it retains the option

1    of calling percipient witnesses"  in cases where the government uses the summary witness

2    procedure.  Id. at 1188.

3         Here, there is no evidence that the grand jurors were ever reminded of their authority to call

4    percipient witnesses.[9]  Mr. Salinas recognizes that in Al Mudarris, the government's failure to

5    remind the grand jury of this option was not a basis for dismissal of the indictment, however, Mr.

6    Salinas believes that the Ninth Circuit's admonition is particularly significant in this case for all of

7    the reasons outlined above.  As the Ninth Circuit observed in Al Mudarris, "[i]t is not sufficient that

8    a government agent is credible as to what absent declarants said.  The grand jury must determine

9    whether those declarants, the percipient witnesses of the events underlying the indictment, are

10   sufficiently credible to establish probable cause."  Al Mudarris, 695 F.2d 1188.   In this case, not

11   only was the grand jury deprived of this opportunity, but the summary witness improperly vouched

12   for Ms. Hernandez's credibility.   Cf. Al Mudarris, 695 F.2d at 1187 (noting that while "the

13   summary witness procedure is an economical and expedient means of presenting evidence to a grand

14   jury . . . [t]he prosecutor must not abuse this device by pressuring grand jurors into a precipitous

15   decision or otherwise discouraging them from evaluating the predicate evidence.").

16        As the Ninth Circuit emphasized in Al Mudarris, "[w]hen a summary procedure is combined

17   with overbearing tactics and misleading instructions, the grand jury as a screening device at some

18   point becomes a nullity."  Al Mudarris, 695 F.2d 1188.  In this case, for all the reasons set forth

19   herein, the grand jury was unquestionably a nullity, and the indictment must be dismissed.

20   **B.      THE GOVERNMENT EITHER KNEW OF THE FALSITY OR WAS
             DELIBERATELY IGNORANT, AND THE GOVERNMENT CANNOT
21           DENY THAT IT IS NOW AWARE OF THE FALSITY**

22        The government may claim that it did not know at the time of the grand jury proceedings

23   regarding the extent of the complaining witness's mendacity, or regarding the extent of the false

24   _____

25        [9] In the event that the Court has questions about the precise instructions received by the grand
     jury, Mr. Salinas requests that the Court review the grand jury instructions, which were not disclosed
26   to the defense.

1   testimony presented by its summary witness.   In the event that the government makes this argument,

2   Mr. Salinas will address it in more detail in his reply brief.  Due to the length of this motion, Mr.

3   Salinas will reserve a detailed response and simply state that the Court should reject this argument

4   outright.  In short, all of the documents and information referenced herein: (1) were actually

5   reviewed by the agent prior to the grand jury proceedings (e.g., the Hernandez Police Report and the

6   12/3/12 telephone call); (2) would necessarily have been located through routine law enforcement

7   background checks of Ms. Hernandez and Ms. Delatorre (e.g. Hernandez's asylum status, asylum

8   declaration, and asylum hearing, and the Delatorre police report); or (3) were known to the

9   government and readily available (e.g., the status of the DIF investigation and the DIF witness

10  statements).

11          As to any specific information or document about which the government may attempt to

12  demonstrate that it did not have actual knowledge, was not deliberately ignorant, and could not have

13  obtained through routine law enforcement checks, there is no question that the government now has

14  knowledge of the material falsity of the testimony.  Accordingly, the government's post-indictment

15  knowledge is sufficient under <u>Basurto</u> to require dismissal of the indictment.  As noted earlier, if the

16  Court has any question regarding the extent of the government's knowledge at the time of the grand

17  jury proceedings, the Court should hold an evidentiary hearing.  See <u>Siriprechapong</u>, 181 F.R.D. at

18  430-35.

19  **C.     THE COURT SHOULD EXERCISE ITS SUPERVISORY POWERS WITH
          RESPECT TO ANY FUTURE GRAND JURY PROCEEDINGS**

20
            The government has indicated that it may voluntarily return to the grand jury to obtain a

21  superseding indictment.  The Court should set a date certain by which the government must make

22  this determination, for example, thirty days from the date of the hearing on this motion.  At that time,

23  the Court should dismiss the indictment if the government has not acted.

24
            In the event that future grand jury proceedings occur, either due to the government's

25  voluntary action or as a result of dismissal of the indictment by the Court,  Mr. Salinas respectfully

26

MOT. TO DISM. DUE TO FALSE TESTIMONY,
WITHHELD EVID. & VOUCHING BEFORE G.J.
No. CR 12-00887 EJD                                27

1   requests that the Court exercise its limited supervisory powers with respect to grand jury

2   proceedings and order the following with respect to any future grand jury proceedings: the

3   government may not materially contradict any withheld evidence or vouch for the credibility of any

4   witness. The Court should also order the government to present the following documents and allow

5   the grand jury sufficient time to review the documents: (1) Sarani Hernandez Case Status, Asylum

6   Declaration, and Summary of Asylum Hearing, Ex. B, C, D; (2) Transcript of December 3, 2012

7   recorded call, Docket #58-1; (3) Translations of DIF file, Docket #63; and (4) Delatorre Police

8   Report, Docket #64-1.

9                           **IV.**

10                    **CONCLUSION**

11       The government's conduct, whether considered in isolation or cumulatively, resulted in

12   fundamentally unfair proceedings and prejudiced Mr. Salinas by substantially influencing the grand

13   jury's determination. Accordingly, the Court should dismiss the indictment pursuant to the Fifth

14   Amendment and the Court's supervisory powers.

15

16                              Respectfully submitted,

17                              STEVEN G. KALAR
                                    Federal Public Defender

18

19

20   Dated: September 18, 2014              _____/s/_____
                                    ROBERT CARLIN
                                    Assistant Federal Public Defender

21

22

23

24

25

26