MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

JEFFREY D. NEDROW (CABN 161299)
JEFFREY B. SCHENK (CABN 234355)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5045
    FAX: (408) 535-5066
    jeff.nedrow@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: CR  12-00887-EJD |
| Plaintiff, | |
| v. | UNITED STATES' OPPOSITION TO MOTION TO DISMISS INDICTMENT |
| JESUS SALINAS and PATRICIA DE LA TORRE, | |
| Defendants. | |

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................1

II.    STATEMENT OF FACT .............................................................................2

    A.    Overview of The Kidnapping ...........................................................2

    B.    The Indictment .................................................................................8

III.   ARGUMENT ...............................................................................................9

    A.    Legal Standard .................................................................................9

    B.    Special Agent Chesson's Testimony Was Truthful and Accurate, and The Defense Has   Failed To Prove Any Material Misrepresentations Or Vouching Which Would Support The Extreme Remedy of Dismissal ................................................10

    C.    The Government's Responses to Defendant's Claims of "Perjury" ....................11

        1.    Immigration Status of Hernandez ........................................11

        2.    Location of Children ............................................................12

        3.    Hernandez's Lack Of A Prior Connection to Salinas ..........13

        4.    The 2011 Border Crossing Attempt .....................................14

        5.    Salinas's Placement of Children With Valenzuela Over Hernandez's Objection ..............................................15

        6.    Testimony Regarding Extortionate Demands for Money by Salinas's Mother-in-Law ..............................................16

        7.    Delatorre's Threats..............................................................17

        8.    Role of Threats In Hernandez's Departure from Washington ..............................18

        9.    Valenzuela's Denial of Access To The Children....................20

        10.   Reasons for Ibanez's and Beecher's Reluctance To Report Kidnapping ..............21

        11.   Salinas and Delatorre's Refusal To Return The Children and Ongoing Extortion ..............................................22

        12.   Agent's Description of 2012 Recorded Phone Call................23

        13.   Testimony Confirming Children With Valenzuela................25

        14.   Status of Children At Time of Rescue ..................................26

    D.    Other misconduct claims...............................................................27

        1.    Questions posed by grand jurors..........................................27

2.      The Government's Witness Did Not Engage in Vouching....................................28

E.      The Government Is Permitted To Use Summary Witnesses, And Was Not
        Required To Elicit The Testimony of Percipient Witnesses.................................31

F.      The Government's Intent To Supersede ..............................................................33

IV.  CONCLUSION...........................................................................................................33

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988) .................................................. 11

*Cheney v. Washington*, 614 F.3d 987 (9th Cir. 2010) ........................................................... 29

*Costello v. United States*, 350 U.S. 359 (1956). .............................................................. 33, 34

*Government of Virgin Islands in Interest of A.M.*, 34 F.3d 153 (3rd Cir. 1994) ................................................................................................................ 33

*United States v. Angel*, 355 F.3d 462, 475 (6th Cir. 2004) .................................................. 25

*United States v. Barrera-Moreno*, 951 F.2d 1089 ............................................................. 10

*United States v. Basurto*, 497 F.2d 781 (9th Cir. 1974) ..................................................... 11

*United States v. Brooks* 508 F.3d 1205 (9th Cir. 2007) ...................................................... 29

*United States v. Calandra*, 414 U.S. 338 (1974) ......................................................... 32, 33

*United States v. Daas*, 198 F.3d 1167 (9th Cir. 1999) ...................................................... 31

*United States v. De Rosa*, 783 F.2d 1401 (9th Cir. 1986) .................................................. 26

*United States v. Giorgi*, 840 F.2d 1022, 1032 (1st Cir. 1988) ............................................ 27

*United States v. Harkonen*, 2009 WL 5166246 (N.D. Cal. Apr. 15, 2009) ............................ 11

*United States v. Hastings*, 461 U.S. 499 (1983) .............................................................. 31

*United States v. Isgro*, 974 F.2d 1091 (9th Cir. 1992) ................................................ 10, 11

*United States v. Jacobs*, 855 F.2d 652 (9th Cir. 1988) ...................................................... 10

*United States v. Jarrett*, 447 F.3d 520 (7th Cir. 2006) ..................................................... 25

*United States v. Kamerud*, 326 F.3d 1008, 1015 (8th Cir. 2003) ........................................ 33

*United States v. Kearns*, 5 F.3d 1251 (9th Cir. 1993) ....................................................... 11

*United States v. Landham*, 251 F.3d 1072 (6th Cir. 2001) ................................................ 33

*United States v. Lopez*, 4 F.3d 1455 (9th Cir. 1993) ........................................................ 10

*United States v. Molina*, 934 F.2d 1440 (9th Cir. 1991) .................................................... 29

*United States v. Nash*, 115 F.3d 1431 (9th Cir. 1997) ...................................................... 29

*United States v. Necoechea*, 986 F.2d at 1278 (9th Cir. 1993) ........................................... 29

*United States v. Ortiz de Jesus*, 230 F.3d 1 (1st Cir. 2000) .......................................... 32, 33

*United States v. R. Enterprises, Inc.*, 498 U.S. 292 (1991) ......................................................... 32

*United States v. Restrepo*, 930 F.2d 705 (9th Cir. 1991) ........................................................... 10

*United States v. Rosario*, 234 F.3d 347 (7th Cir., 2000) ........................................................... 32

*United States v. Rudberg*, 122 F.3d 1199 (9th Cir. 1997) .......................................................... 29

*United States v. Sager, 227  F.3d 1128, 1149 (9th Cir. 2000)* ................................................... 11

*United States v. Solomon*, 825 F.2d 1292, 1300 (9th Cir. 1987) ............................................... 31

*United States v. Taylor*, 154 F.3d 775, 681 (7th Cir. 1998) ....................................................... 33

*United States v. Waldon*, 363 F.3d 1103 (11th Cir. 2004) .......................................................... 32

*United States v. Walker*, 410 F.3d 754 (5th Cir. 2005) .............................................................. 32

*United States v. Weatherspoon*, 410 F.3d 1142 (9th Cir. 2005) ................................................ 29

*United States v. Williams*, 504 U.S. 36 (1992) ............................................................... 11, 25, 33

*United States v. Williams*, 989 F.2d 1061 (9th Cir. 1993) .......................................................... 29

*United States v. Woodley*, 9 F.3d 774, 777 (9th Cir. 1993) ....................................................... 11

*United States v. Wright*, 625 F.3d 583 (9th Cir. 2010) .............................................................. 29

## FEDERAL STATUTES

18 U.S.C. §  1201(a) ................................................................................................................... 10

18 U.S.C. §  1203(a) ................................................................................................................... 10

## FEDERAL RULES

Fed.R.Evid. 1101(d)(2) ............................................................................................................... 33

# I.   INTRODUCTION

Defendant Jesus Salinas has filed a motion to dismiss the indictment in this case.  The defendant's motion offers an assortment of baseless arguments alleging government misconduct before the grand jury, including accusations of vouching, failure to present exculpatory evidence to the grand jury, purportedly misleading presentations of evidence, and the prosecutor's decision not to answer questions posed by grand jurors.  At its core, however, the defense motion is centered on the false claim that the government's witness, FBI Special Agent Christina Chesson, made several intentional and materially inaccurate statements during her testimony before the grand jury.  Under the defense theory, the government provided intentionally false testimony to the grand jury, and those false statements are sufficiently material and substantial as to require the extreme remedy of dismissal of the indictment.

This motion is factually and legally meritless, and should be denied outright.  The record demonstrates that the agent testified truthfully and accurately in the grand jury, and the allegations in the indictment are fully supported by the evidence.  The defense has not even come close to the high burden required to justify pretrial dismissal of the indictment.  The defense motion labors to find discrepancies in the record, in some cases simply making them up out of whole cloth, in a transparent effort to generate inconsistencies.  The defense seems to believe it appropriate to claim government perjury in each instance where the defense has the ability to make up an argument regarding the facts.  But factual disagreements and inconsistencies do not constitute perjury.  The question in examining these allegations is not whether the defense can make arguments regarding the government's proof, but whether the defense has proven that the agent intentionally provided false testimony to the grand jury in an effort to secure an indictment.  Measured by the proper standard, the defense motion is a complete failure.  The defense cannot prove a single instance of an intentional, material false statement that could have prejudiced the grand jury in this case.  The defense is entitled to make the arguments it wishes at trial through calling its own witnesses, cross-examination, and presentations to the jury.  But the time to argue about facts is at trial, not through a pretrial motion full of false and misleading allegations.

There is no evidence of government misconduct here.  The FBI agent testified truthfully and accurately regarding the facts available to her at the time of the testimony.  The defendant's motion is a disingenuous effort to argue its case and miscast its own self-serving arguments under the guise of

"facts."  The government looks forward to the opportunity to have the actual facts assessed by a jury at trial, but this is not the stage for closing arguments.  As the defense has failed to provide a legal or factual basis for dismissal, the motion should be denied.

## II.   STATEMENT OF FACT

### A.   Overview of The Kidnapping

On December 3, 2012, FBI Special Agent Christina Chesson met Sarani Hernandez at the Watsonville Police Department.  See Exhibit 1, Declaration of Special Agent Christina Chesson, and Exhibit 2, December 19, 2012 Grand Jury Transcript of Testimony of Special Agent Chesson, filed separately under seal with this motion.  Hernandez had come to the Watsonville Police Department to report the kidnapping of her two juvenile U.S. citizen sons, herein identified as E.M. (age 11) and A.J. (age 9).  Exhibit 2, p. 6.

In reporting the kidnaping, Hernandez told Agent Chesson that a woman named Maria Guadalupe Valenzuela Castaneda (hereafter, "Valenzuela") had her boys in Juarez, Mexico.  Exhibit 2, p. 9.  Hernandez told Agent Chesson that Valenzuela refused to return the boys or tell Hernandez where the boys were being held, and was demanding money for their return.  Exhibit 2, p. 9.

Hernandez was a Mexican citizen who had illegally entered the United States for work purposes prior to 2008 and again in 2011.  Exhibit 2, p. 11.  At the time of the 2012 interview, Agent Chesson understood that Hernandez was not legally in the United States.  Exhibit 2, p. 11.  In 2008, Hernandez had been living in Mount Vernon, Washington with the father of her three children.  Exhibit 2, p. 10.  (Hernandez also had an older son who was not involved in the kidnapping.  Exhibit 2, p. 10.)  In 2008, after returning to Mexico with her husband, Hernandez decided to leave the marriage, which had become an abusive relationship, and return with her three children to stay with her mother in Michoacan, Mexico.  Exhibit 2, p. 10.  Hernandez lived in Mexico with her sons from 2008 until approximately 2011.  Exhibit 2, p. 10.  In 2011, Hernandez decided to illegally re-enter the United States by herself to find work.  Exhibit 2, p. 10.  For safety reasons, Hernandez did not want to involve her young sons, who were U.S. citizens, in the process of illegally coming over the border with her, so she decided to leave them with her mother.  Exhibit 2, pp. 12-13.  After returning to Washington, Hernandez sought assistance for the transport of her sons to the U.S.  Exhibit 2, pp. 10, 13.

Hernandez told Agent Chesson that in June 2011, Hernandez's brother, Juan Ramon Hernandez Ramirez, put her in contact with defendant Jesus Salinas, a.k.a. Jesus Albor (hereafter, Salinas).  Exhibit 2, pp. 13-14.  Juan Ramon Hernandez Ramirez knew Salinas's brother.  Salinas was previously unknown to Hernandez.  Salinas assured her that he had previously brought children over the border.  Exhibit 2, p. 13-14.

According to Hernandez, Salinas agreed to transport Hernandez's children to the United States for $700.  Exhibit 2, pp. 14-15.  Hernandez sent the initial $700 to the attention of Salinas through a wire-transfer to Texas for the purpose of transportation.  Exhibit 2, p. 16.  Salinas also requested and received copies of the boys' birth certificates.  Exhibit 2, p. 15.  Salinas agreed to go to Hernandez's mother's residence in Michoacan to pick up the boys and bring them over the border.  Exhibit 2, p. 15.  However, after Salinas had picked up the boys, he called Hernandez and told her that he had been delayed in Mexico, and needed more money.  Exhibit 2, p. 15.  Accordingly, Hernandez sent Salinas an additional $600.  Exhibit 2, p. 15.  This additional sum was sent to Salinas by wire-transfer on July 1, 2011.  Exhibit 2, pp. 17-18.

Salinas called Hernandez again in early July 2011.  Exhibit 2, p. 19.  Salinas told Hernandez that there was a festival, and he was going to take the boys to the festival.  Exhibit 2, p. 19.  Salinas called again a couple of days later.  Exhibit 2, pp. 15, 19.  On this occasion, Salinas told Hernandez that he had not been able to get the boys over the border because law enforcement had stopped him and questioned the authenticity of the boys' birth certificates, and that as a consequence he was not bringing the children to her in Washington State, as he had promised to do in exchange for the $1300 she had paid him.  Exhibit 2, pp. 15, 19.  Hernandez told Agent Chesson that Salinas told Hernandez that he had been detained by law enforcement.  Exhibit 2, p. 20.

Salinas told Hernandez that he was working on the transport of the boys with his wife, co-defendant Patricia Delatorre.  Exhibit 2, p. 15.  Salinas further stated that Delatorre had taken the boys to the residence of her mother, Valenuzela, in Juarez, Mexico.  Exhibit 2, pp. 15, 19.

Hernandez told Special Agent Chesson that Hernandez protested and insisted that Salinas take the boys back to Hernandez's mother's residence.  Exhibit 2, p. 15.  According to Hernandez, Salinas refused.  Exhibit 2, pp. 15, 20.  Salinas told Hernandez that he had to get back to the U.S. and that the

boys were going to be in Juarez.  Exhibit 2, pp. 20-21.  Hernandez had no other means (other than

Salinas) to contact her children, as she did not know Delatorre or Valenzuela.  Exhibit 2, p. 15.  For

health reasons, Hernandez's mother was not able to travel to Juarez from Michoacan.  Exhibit 2, p. 21.

Hernandez told Agent Chesson that she asked Salinas for Valenzuela's address, so that she could

contact her children.  Exhibit 2, p. 21.  Salinas refused to provide it to her.  Exhibit 2, p. 21.  Salinas

continued, however, to demand more money.  Exhibit 2, p. 21.  Salinas told Hernandez that, contrary to

their agreement, he was not going to bring the boys over the border, but he still wanted more money

because he and his family members still had the boys.  Exhibit 2, p. 21.  When Hernandez pointed out

that she had already given him $1300 and Salinas had not transported the boys, Salinas replied that he

had already spent that money, it was gone, and he wanted more money, and she needed to contact

Valenzuela to arrange a payment schedule with Valenzuela.  Exhibit 2, p. 21.

When Salinas returned to Washington State, Hernandez met with him.  Exhibit 2, pp. 15, 21-22.

On this occasion, Hernandez again demanded to have her children returned to her, and Salinas again

refused to return her children.  Exhibit 2, p. 22.  Hernandez told Agent Chesson that on the occasion of

this meeting, she again asked Salinas for the address of the residence where her children were being

held, and Salinas again refused to disclose the boys' location to Hernandez.  Exhibit 2, p. 22.  However,

Salinas did give Hernandez a telephone number for Valenzuela in Juarez.  Exhibit 2, p. 22.  Salinas told

Hernandez to call Valenzuela.  Exhibit 2, p. 22.  Salinas told Hernandez that she needed to start sending

money.  Exhibit 2, p. 22.

Hernandez subsequently spoke to Valenzuela by telephone.  Exhibit 2, p. 22.  Valenzuela

admitted that she had the boys.  Exhibit 2, p. 22.  Like Salinas, Valenzuela refused to provide the boys'

location, and like Salinas, she demanded Hernandez send her money.  Exhibit 2, p. 22.

Valenzuela allowed Hernandez to talk with the boys.  Exhibit 2, p. 23.  However, according to

Hernandez, Hernandez was not permitted to speak privately with her children.  Exhibit 2, p. 23.

Hernandez believed that Valenzuela was coaching and controlling the boys' responses.  Exhibit 2, p. 23.

From approximately July 2011 through April 2012, Valenzuela consistently limited Hernandez's

communications with her children.  Exhibit 2, p. 23.  Hernandez would call, and ask to speak to her

children.  Exhibit 2, p. 23.  Valenzuela coached the boys on what to say.  Exhibit 2, p. 23.  Private conversations on the phone were not permitted.  Exhibit 2, p. 23.  Valenzuela consistently refused to provide the location of the children.  Exhibit 2, p. 23.

Valenzuela continued to demand money from Hernandez during this period of time, and Hernandez consistently sent money.  Exhibit 2, p. 24.  Hernandez told Agent Chesson that the financial arrangement was that Hernandez would send between $50-$65 a week to Valenzuela.  Hernandez told Agent Chesson that she believed that she had sent a total of approximately $5,000 to Valenzuela during the overall period of time Salinas, Delatorre and Valenzuela held her children.  Exhibit 2, p. 24.

Hernandez told Agent Chesson that in November 2011, Valenzuela began to make other demands upon Hernandez.  Exhibit 2, p. 24.  Specifically, Valenzuela demanded that Hernandez send clothes for the boys.  Exhibit 2, p. 24.  At this point, Hernandez again asked Valenzuela to provide an address for the boys, and Valenzuela again refused.  Exhibit 2, p. 24.  Valenzuela responded by telling Hernandez to send the clothes to her son Fernando Delatorre at an address in New Mexico.  Exhibit 2, p. 24.  Hernandez sent the clothes to Fernando Delatorre on November 15, 2011.  Exhibit 2, p. 25.  Hernandez did not know Fernando Delatorre and had never met him.  Exhibit 2, p. 26.  Hernandez told Agent Chesson that Hernandez was told to send the clothes to Fernando Delatorre, because she could not have the address for Valenzuela.  Exhibit 2, p. 26.  Accordingly, Hernandez would have to use the alternative New Mexico address to facilitate the delivery of items to the boys.  Exhibit 2, p. 26.

As Salinas, Delatorre, and Valenzuela had been extorting her and holding her children hostage at this point for approximately four months, Hernandez began to explore other alternatives in an effort to get her children back.  Exhibit 2, p. 26.  Hernandez went to a local church to ask for help.  Exhibit 2, p. 26.  Hernandez also went to various community organizations, including speaking to a social worker and women's advocate with an organization called Help Women.  Exhibit 2, p. 26.  Hernandez kept making payments.  Exhibit 2, pp. 26-27.  Hernandez believed that if she stopped making the payments, it would be unsafe for her children.  Exhibit 2, p. 27.  Hernandez was convinced that she would not be permitted to continue to speak to her children on the phone, if she did not make payments.  Exhibit 2, p. 27.

Hernandez's concerns about the welfare of her children continued.  Hernandez told Agent Chesson that the boys told her that they were afraid, that they heard gunshots every night, and that they had seen a man shot and killed near the school that was near them.  Exhibit 2, pp. 28-29.  The boys told Hernandez that they wanted to come home and they were afraid.  Exhibit 2, p. 29.

In April 2012, Salinas, Delatorre, and Valenzuela continued to hold the children in Juarez.  Exhibit 2, p. 29.  At this point, the defendants had held the children, and refused to disclose their location to Hernandez despite her repeated requests, for approximately nine months.  Exhibit 2, p. 29.  Hernandez again made a pointed request for the address and precise location of the boys.  Exhibit 2, p. 29.  Valenzuela again refused to provide the address and location.  Exhibit 2, p. 29.  At this point, Hernandez told Valenzuela that she planned to go to the police and report the matter as a kidnapping.  Exhibit 2, p. 29.  In response, according to Hernandez, Valenzuela threatened Hernandez, and told Hernandez that if she came to Juarez, they would kill her.  Exhibit 2, p. 29.

The threats to Hernandez did not end with Valenzuela's death threat.  Salinas's wife, Patricia Delatorre, threatened to have immigration authorities arrest Hernandez in light of her status as an illegal alien.  Exhibit 2, p. 29.  Delatorre specifically threatened to contact immigration authorities, if Hernandez failed to send more money to Valenzuela.  Exhibit 2, p. 29.  Fernando Delatorre said he would personally drive to Washington and kill Hernandez, if Hernandez called the police.  Exhibit 2, p. 29.

Following the death threats from Salinas's extended family members, as well as Delatorre's threat to call immigration authorities if Hernandez failed to send more money to Valenzuela, Hernandez left Washington State in the spring of 2012.  Exhibit 2, p. 30.  Hernandez left, because she was afraid in light of the threats from Salinas's extended family members.  Exhibit 2, p. 30.  Hernandez relocated to Watsonville, California. Exhibit 2, p. 30.  Following Hernandez's departure from Washington, immigration authorities did, in fact, show up at her residence, just as Salinas's wife, Delatorre, had threatened.  Exhibit 2, p. 31.  Hernandez was told by a friend that the immigration authorities arrived right after Hernandez had left Washington, and that they were looking for Hernandez.  Exhibit 2, p. 31.

During one phone call in 2012, Hernandez was permitted to speak with the older of the two boys.  Exhibit 2, p. 30.  Hernandez told Agent Chesson that she attempted, in this conversation, to elicit

information about the boys' whereabouts. Exhibit 2, p. 30. To that end, Hernandez asked her son about nearby stores, signs, or the name of a road or school. Exhibit 2, pp. 30-31. According to Hernandez, shortly after beginning this line of inquiry, the phone was disconnected. Exhibit 2, p. 31. Following this particular call, Valenzuela changed her phone numbers, and Hernandez did not speak to her children again until December 2012, in a consensually recorded call. Exhibit 2, p. 31.

In September 2012, approximately 14 months after Salinas left Hernandez's children with his family members against her request, Hernandez again sought the assistance of others. Exhibit 2, p. 32. In an effort to assist Hernandez, a social worker, Elizabeth Ibanez, and a pastor, Josefina Beecher, personally met with Salinas and Delatorre at Salinas and Delatorre's apartment in Washington State. Exhibit 2, p. 32. During the meeting, Ibanez and Beecher told Salinas and Delatorre that Hernandez wanted her children back. Exhibit 2, p. 30.

Salinas and Delatorre responded by saying that they were not going to return the children to Hernandez until they were paid. Exhibit 2, p. 32. Salinas and Delatorre further stated that they were not going to give Hernandez the address where the children were being held. Exhibit 2, p. 32. Salinas and Delatorre further stated that they wanted more money from Hernandez. Exhibit 2, p. 32. Salinas and Delatorre further stated that Hernandez would not get her children back until Hernandez paid. Exhibit 2, p. 32. Delatorre did most of the talking for the couple during this meeting; however, Salinas was present and a participant in the meeting, and while he said he did not want "trouble," he did nothing to express any disagreement whatsoever with the extortionate demands made by his wife in his presence. Exhibit 2, p. 32. Salinas did provide a new telephone number for Valenzuela. Neither Ibanez nor Beecher contacted law enforcement regarding the extortionate demands made by Salinas and Delatorre, apparently as a result of concerns that contacting law enforcement might create adverse immigration consequences for Hernandez. Exhibit 2, p. 33.

In October 2012, Hernandez re-initiated contact with Valenzuela, and Valenzuela continued to demand more money. Exhibit 2, p. 34. At one point during this period of time, Hernandez again suggested the possibility of a third party traveling to Juarez to pick up the children, as Hernandez had actually found someone who was willing to make the trip and retrieve the children. Exhibit 2, p. 34. Hernandez also reiterated that she wanted her children back. Exhibit 1, p. 34. Hernandez told Agent

Chesson that Valenzuela told Hernandez, "Don't come to Juarez, or we will kill you. Something bad would happen." Exhibit 2, p. 34. Valenzuela also told Hernandez that the children were staying with her. Exhibit 1, p. 34. Hernandez then contacted an attorney and subsequently the Watsonville Police Department, leading to contact with the FBI. Exhibit 2, p. 35.

After speaking to Hernandez in December 2012, Agent Chesson suggested that Hernandez make a telephone call to Valenzuela and record it, and Hernandez agreed to do so. Exhibit 2, p. 36. The call was made in Spanish, with Spanish-speaking detectives monitoring the call. Exhibit 2, p. 36. At Agent Chesson's direction, Hernandez called Valenzuela and told Valenzuela that she wanted her children back. Exhibit 2, p. 36. Hernandez placed the call to Valenzuela on December 3, 2012. Exhibit 2, p. 36. (A copy of the transcript of the call is attached as Exhibit 3 to the Government's Opposition). During the call, Hernandez told Valenzuela that she wanted her children back, and asked what Valenzuela wanted in order to make it happen. Exhibit 2, p. 36; Exhibit 3. Valenzuela demanded money from Hernandez, but refused to name the sum, and also refused to tell Hernandez where the children were located. Exhibit 2, pp 36-37; Exhibit 3. Valenzuela allowed one of the boys to speak with his mother. Exhibit 2, p. 37. The other boy could be heard in the background. Exhibit 1, p. 37. As Agent Chesson explained, the confirmation of the presence of the boys was significant in confirming the kidnap allegations. Exhibit 2, pp. 37-38. During the taped conversation, Valenzuela also denied that her conduct constituted a kidnapping, denied her interest in money, and made a number of statements suggesting Hernandez had abandoned her children. These statements were not provided to the grand jury during Agent Chesson's testimony.

The FBI was able to independently identify the location of the boys in Juarez. Exhibit 2, p. 38. On December 11, 2012, agents from the United States and Mexico found the boys in Juarez, Mexico. Exhibit 2, p. 38. The boys were around the corner at a school playing at the time agents located them. Exhibit 2, p. 38. The boys were taken into law enforcement custody. Exhibit 2, pp. 38-39. Following discussions between officials with the U.S. Government, Mexican social service agencies, and officials with California Child Protective Services, the children were reunited with their mother.

**B.    The Indictment**

Salinas, Delatorre, and Valenzuela are charged in a three-count indictment. The first count

1  charges all three defendants with a violation of 18 U.S.C. § 1201(a), (c), and (g)(1), kidnaping a minor

2  victim in interstate and foreign commerce, based upon Salinas's and Delatorre's unlawful and

3  unauthorized placement of the children with Valenzuela, their refusal to provide the location of the

4  children, and the trio's ongoing use of the children as leverage to extort money from Hernandez. The

5  second and third counts charge all three defendants with seizure and detention of a national of the

6  United States, also known as "hostage taking," in violation of 18 U.S.C. § 1203(a) (one count is

7  charged for each of the two boys). While the defense motion summarizes a number of disagreements

8  regarding the facts, it is notable what cannot be seriously disputed: that Salinas, Delatorre, and

9  Valenzuela kept Hernandez's children in Juarez in the home of a stranger for nearly 18 months, during

10  which time they expressly refused to return the boys, refused to disclose their location, and consistently

11  demanded money from Hernandez.

### III.   ARGUMENT

#### A.   Legal Standard

14         The dismissal of an indictment based on alleged misconduct is an "extreme remedy"

15  and is "disfavored" because it is "the most severe sanction possible." United States v. Lopez, 4 F.3d

16  1455, 1464 (9th Cir. 1993); United States v. Isgro, 974 F.2d 1091, 1097 (9th Cir. 1992); United States v.

17  Jacobs, 855 F.2d 652, 655 (9th Cir. 1988). The Ninth Circuit has held that this extreme remedy should

18  only be granted in two limited circumstances.

19         First, a district court may dismiss an indictment for alleged government misconduct where the

20  government misconduct amounts to a due process violation. United States v. Barrera-Moreno, 951 F.2d

21  1089, 1091 (9th Cir. 1991). This involves "conduct which is so grossly shocking and so outrageous as to

22  violate the universal sense of justice." United States v. Restrepo, 930 F.2d 705, 712 (9th Cir. 1991)

23  (citations omitted). Examples of such outrageous conduct include cases where (1) racial discrimination

24  has been used in the selection of the grand jurors, (2) women have been excluded from the grand jury, or

25  (3) the government allows a defendant to stand trial on an indictment which it knows to be based on

26  perjured testimony material to the return of that indictment. Bank of Nova Scotia v. United States, 487

27  U.S. 250, 257 (1988); United States v. Basurto, 497 F.2d 781, 785 (9th Cir. 1974). Dismissal based on

28  perjury requires both knowledge and materiality to prevent mere misstatements or poor word choices

from forming the basis of a motion to dismiss.  <u>United States v. Sager</u>, 227  F.3d 1128, 1149 (9th Cir. 2000); <u>United States v. Harkonen</u>, 2009 WL 5166246, *5-6 (N.D. Cal. Apr. 15, 2009).

Second, "[i]f the conduct does not rise to the level of a due process violation, the court may nonetheless dismiss under its supervisory powers." <u>Barrera-Moreno</u>, 951 F.2d at 1091.  This is distinguishable from a dismissal on due process grounds because there is no presumption of prejudice to the defendant.  Id. at 256-157.  "To justify such an extreme remedy, the government's conduct must have caused substantial prejudice to the defendant and been flagrant in its disregard for the limits of appropriate professional conduct." <u>United States v. Lopez</u>, 4 F.3d at 1464; see <u>United States v. Kearns</u>, 5 F.3d 1251, 1253-4 (9th Cir. 1993) ("Dismissal under the court's supervisory powers for prosecutorial misconduct requires (1) flagrant misbehavior and (2) substantial prejudice.").

A district court may not dismiss an indictment under its supervisory powers if the defendant has failed to demonstrate substantial prejudice.  See, e.g., <u>Id</u>. at 254 ("a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants"); <u>United States v. Woodley</u>, 9 F.3d 774, 777 (9th Cir. 1993) (government's refusal to disclose Brady materials was not flagrant or prejudicial and did not justify dismissal of indictment); <u>United States v. Isgro</u>, 974 F.2d at 1096-99 (dismissal of indictment based on alleged misconduct for failure to disclose prior testimony reversed because defendant suffered no prejudice).

**B.      Special Agent Chesson's Testimony Was Truthful and Accurate, and The Defense Has   Failed To Prove Any Material Misrepresentations Or Vouching Which Would Support <u>The Extreme Remedy of Dismissal</u>**

The defense has opted for a "laundry list" approach to this motion, conjuring every conceivable form of misconduct it can articulate in a transparent effort to make up arguments regarding the government's grand jury presentation.  At its core, however, the motion to dismiss the indictment in this case is based on what the defense argues are false statements that Special Agent Chris Chesson made to the grand jury.  The defense allegations in this regard are uniformly false.  Agent Chesson testified truthfully and completely to the best of her ability in the grand jury.  See, Exhibit 1, <u>October 8, 2014 Declaration of Chris Chesson</u>, filed today in connection with this motion.  The defense motion utterly fails to show that Agent Chesson provided intentional false statements in this case.  To the contrary, her

testimony accurately summarized the facts in support of charging Salinas, Delatorre, and Valenzuela for their role in the kidnapping and detention of Hernandez's children.  At best, the defense highlights documents and testimony which may provide him with a basis to make certain arguments at trial.  As the defense has failed to demonstrate that the agent made any intentional false statements, the motion must be denied.

The defense also argues that the government failed to present exculpatory evidence to the grand jury.  As discussed below, the government does not view the false and self-serving evidence provided by the defense as exculpatory, and even if this evidence may arguably be viewed as exculpatory, the government is not required to present exculpatory evidence to the grand jury.  United States v. Williams, 504 U.S. 36, 52-54 (1992).  The additional arguments made by the defense, regarding vouching, summary witnesses, and the responses to the grand jury's questions, are legally unsupportable, and plainly do not provide any cognizable basis to dismiss the indictment.

### C. The Government's Responses to Defendant's Claims of "Perjury"

#### 1. Immigration Status of Hernandez

On December 19, 2012, Agent Chesson testified that Hernandez "is a Mexican citizen. She's not in the U.S. legally."  Exhibit 2, p. 11.

Salinas argues this testimony is false because subsequent discovery provided by the government indicated that a "final" decision regarding Hernandez's application for asylum had been granted on October 1, 2012, prior to the grand jury proceedings.  See Defense Exhibit B.

The defense claim of falsity as to this testimony is meritless for the following reasons:

A. Special Agent Chesson understood from her conversations with Hernandez and her review of records that Hernandez had crossed the border illegally and was an undocumented alien.  Based on this information, Special Agent Chesson described Hernandez as a Mexican citizen who was not legally in the United States during her grand jury testimony.

B. There is no dispute that Hernandez was, in fact, an undocumented alien who illegally entered the United States in 2011.  Hernandez subsequently pursued an application for asylum in 2012.

C. Agent Chesson knew that Hernandez was pursuing an asylum application, but did not know about the first-level recommendation by government authorities to grant Hernandez asylum until after her grand jury testimony.

D. Subsequent documentation suggests that the actual final approval of Hernandez's application via "concurrence" by Headquarters of Homeland Security did not occur until March 15, 2013.

Agent Chesson truthfully testified to the information provided to her by Hernandez. There is no dispute that Hernandez did, in fact, originally cross illegally and was originally an undocumented alien. Agent Chesson was unaware of the status of the asylum application at the time of her testimony. Moreover, the defense papers themselves acknowledge that the process was not final but subject to further "concurrence" by Homeland Security Headquarters. See Defense Motion, footnote 2. The fact that a further "concurring" decision was required indicates that the decision, by definition, was not final.

In addition, the defense cannot articulate how this fact is material or would have prejudiced the defense, an element it must prove in order to warrant dismissal of this case. In other words, the defense has failed to show how the agent's testimony, if inaccurate, would have affected the grand jury's decision. The defense does not even bother to make an argument in this regard. Indeed, one could argue that Agent Chesson's identification of Hernandez as an undocumented immigrant (as opposed to one qualified for asylum) was less favorable to the government for all of the reasons that references to immigration status are sometimes ruled inadmissible.

The agent testified truthfully to the best of her knowledge on the question of Hernandez's immigration status, and the defense has failed to demonstrate the testimony was intentionally false, inaccurate, or material. Accordingly, this argument does not support dismissal of the indictment.

### 2. Location of Children

The second allegedly false statement relates to Agent Chesson's testimony that Hernandez left her three children with her mother when she returned to the United States in 2011. The defense claims that this statement was inaccurate because the two younger boys (the kidnap victims) told Mexican social services authorities that they had stayed with the mother of Hernandez's boyfriend, Enrique Lopez.

The defense argument is meritless for the following reasons:

A. On December 3, 2012 Hernandez told Special Agent Chesson that her children were in the care of her mother in Mexico when she crossed the border into the U.S. Agent Chesson truthfully testified regarding the statements Hernandez made to her during Agent Chesson's grand jury testimony.

B. On April 18, 2013, the FBI conducted forensic interviews with both of the kidnap victims. Both of the boys stated that they had been living with Hernandez's mother during the 2011 time period.

C. The older brother of the two kidnap victims, herein identified as "E.L.," was also interviewed by the FBI.  E.L. stated that the two younger boys lived with Hernandez's mother when she returned to the United States in 2011.

D. Enrique Lopez, Hernandez's boyfriend, was interviewed by the FBI.  Lopez told the FBI that he had understood his mother played a role in transporting the boys to meet with Salinas, but that the boys had not lived long-term with his mother.

Agent Chesson told the grand jury the truth as she understood it regarding the location of the children when Hernandez returned to the United States.  Hernandez told Agent Chesson that she left the children in the care of Hernandez's mother.  The children later provided the same information during a forensic interview in the U.S., and the statement is corroborated by the older brother's interview and by Lopez's interview.

There is considerable evidence that Valenzuela – a person who made multiple death threats to Hernandez – intimidated and coached the boys to an extent that their statements to the Mexican social workers immediately following their term as hostages cannot be taken as completely accurate.  While the government believes it to be true that the children were transported at one point by Lopez's mother, their primary residency during this time was with the maternal grandmother.  The defense has again failed in this instance to demonstrate either materiality or substantial prejudice regarding this particular fact.

As the defense has failed to prove that this statement was intentionally false, inaccurate, or material, it cannot support the motion to dismiss, and the request should be denied as to this claim.

### 3.    Hernandez's Lack Of A Prior Connection to Salinas

Agent Chesson testified that Hernandez said she had no prior connection to Salinas, stating that her "brother put her in contact with someone that a friend of his knew" who had helped children cross the border before. Exhibit 2, p. 13.  The defense claims that this is a materially inconsistent statement because Hernandez, in her asylum hearing, apparently referred to Salinas as "a friend from my town."

The defense claim that this is a material inconsistency is baseless for the following reasons:

A.   Agent Chesson testified truthfully and accurately based upon the information Hernandez provided her.  Hernandez told Agent Chesson that she did not know Salinas prior to the

referral through her brother, and Agent Chesson accurately summarized the information Hernandez provided to her in the grand jury.

B. There is no reason to think Chesson's testimony is inaccurate.  Defendant Delatorre's own statements appear to corroborate Hernandez's statement to Chesson.  In a police report dated April 24, 2012, Delatorre  told the Mount Vernon Police that "her (Delatorre) husband (Salinas) knows Enrique's wife's (Hernandez) brother (Juan)."  Through this link Delatorre and her husband (Salinas) had met Enrique and Sarani Hernandez."

C. Hernandez's statement in the asylum hearing that Salinas was a "friend from my town" is not inconsistent with her statement that she didn't know him prior to the referral.

This claim is baseless.  First, Agent Chesson provided the grand jury with the truthful information as she understood it.  Second, the defense has provided no basis to believe Agent Chesson's testimony was inaccurate.  Delatorre herself told the Mount Vernon police that her link to Hernandez and Lopez was through Hernandez's brother, a fact that the defense fails to bring to the Court's attention in its moving papers.  There is no dispute that Hernandez went through her brother to make her original contact with defendant Salinas.  Hernandez's subsequent referral to Salinas as a "friend" from "her" town does not constitute a contradiction; people commonly refer to friends of friends, or friends of family members, as persons with whom they are "friends."  Nor has the defendant bothered to explain materiality or substantial prejudice.  Why would it matter if Hernandez was "friends" with Salinas, or met him through a friend?   The defense neither acknowledges the need to address this question nor bothers to do so.

In a motion long on rhetoric and short on substance, this is the first of several claims so devoid of merit as to call into question the defendant's good faith in raising it as a material inconsistency.  This claim is completely baseless.  The agent's testimony was accurate, both in terms of what she knew at the time and in terms of the actual facts.  This claim cannot support a motion to dismiss.

### 4.    The 2011 Border Crossing Attempt

Agent Chesson testified that she was unable to find any record of Salinas being detained during her check of criminal history records.  Exhibit 2, p. 20.

The defendant claims that this testimony is false, apparently premised on the fact that the government subsequently obtained border crossing records, which it duly disclosed to the defense, that demonstrate Salinas attempted to cross the border and had contact with law enforcement officials.

The defense claim that this is a false statement is baseless for the following reasons:

A.  Agent Chesson testified truthfully based on the information available to her at the time of her testimony.  Agent Chesson's request for the border crossing records was pending at the time of her testimony, a fact she clearly stated point out to the grand jury.  Exhibit 2, p. 20.  Agent Chesson did not receive the border crossing records until 2013.

B.  Though Agent Chesson did not have the benefit of the border crossing records during her testimony, her testimony nonetheless was accurate.  The border crossing records do not suggest that Salinas was detained.

C.  On February 13, 2013 Agent Chesson interviewed the border crossing officers in El Paso involved in questioning Salinas on the date of the attempted border crossing.  Those agents stated that Salinas was asked to step out of line for a brief interview regarding the border crossing of the children, a level of interaction that does not rise to the level of detention.

This claim constitutes an example of the defense affirmatively attempting to mislead the Court.  Agent Chesson testified truthfully regarding the information she had available to her at the time of her testimony.  Agent Chesson clearly stated in her testimony that she did not have access to the border crossing records, a fact that the defense affirmatively omits in its argument to the  Court.  Moreover, the actual records themselves do not suggest that Salinas was detained, a fact the defense also chooses not to share with the Court.  Nor has the defense made any argument at all as to the materiality of this purported inaccuracy, or how it would have constituted substantial prejudice.

The defense motion has failed to establish that the agent's testimony was intentionally false, inaccurate, or material in any way.  His claim for dismissal on this ground should be denied.

### 5.  Salinas's Placement of Children With Valenzuela Over Hernandez's Objection

Agent Chesson testified that Hernandez "insisted" that her children be taken to her mother in Michoacan after Salinas took her money and abandoned her children in Juarez.  Exhibit 2, p. 15.

The defense claims that Agent Chesson's testimony is false because Hernandez purportedly "asked" for Valenzuela to take care of the boys.

The defense claim on this point is baseless for the following reasons:

A.  Hernandez told Agent Chesson that she repeatedly asked for the children to be sent to her mother.  Agent Chesson truthfully summarized what Hernandez told her in this regarding during her grand jury testimony.

B.  The recorded phone call from Hernandez to Valenzuela in 2012 corroborates Hernandez's desire to have her children returned.  During that recording, Hernandez asks Valenzuela 13 times for her children back.  Valenzuela responds, "when you send me . . . send us the money . . . are you going to send it to me?"

C. Hernandez's statement to the Watsonville Police Department corroborates Hernandez's claim that she wanted the children with her mother.  See Defense Exhibit G.  Hernandez told the Watsonville Police that Albor (Salinas) stated that he would be leaving her children with his mother-in-law (Valenzuela) in Juarez, Mexico. The report confirmed that Hernandez asked Albor if he could take her children back to her mother, and Albor refused to do so.

The defense claim on this point is meritless.  Agent Chesson testified truthfully based on the information provided to her by Hernandez.  The defense argument that Hernandez "consented" to the placement of her sons in Juarez with strangers over an 18-month period of time is absurd, and there is no credible evidence to support it.  The Watsonville Police Report cited by the defense certainly does not support the argument that Hernandez consented to the arrangement; to the contrary, she is clear from the beginning that she wanted her children returned to her mother in Michoacan.  The record clearly supports the government's claim that Hernandez consistently worked hard throughout this period of time to get her children away from Valenzuela, and was both rebuffed and extorted by Salinas, his wife, and his mother-in-law.  There is no basis to claim that the agent's testimony is intentionally false or inaccurate.  The agent testified truthfully regarding Hernandez's statements on this topic.

This particular claim, however, highlights the reasons the defendant's motion to dismiss must be rejected.  The defense claim on this point is pure argument.  It is a trial issue.  At trial, the government will present evidence that Hernandez did not consent to the placement of the children in Juarez.  In turn, the defense is free to present whatever evidence it wishes to present to explain why the defendants felt that they were entitled to hold Hernandez's children hostage at an undisclosed location and extort the mother for funds throughout that period of time.

This claim is really an argument dressed up by the defense to look like a factual conflict.  The defense has failed to show that the agent testified falsely or inaccurately on this point.  This claim cannot support a motion to dismiss.

### 6.   Testimony Regarding Extortionate Demands for Money by Salinas's Mother-in-Law

Agent Chesson testified that Hernandez told her that Valenzuela repeatedly demanded money, and refused to provide the address and location of her children.  Exhibit 2, pp. 22-24.

The defense argues that this testimony is false based upon Hernandez's asylum declaration, in which the defense argues that Hernandez "asked" Salinas and his family to take care of the children.

The defense also cites to a report in which Hernandez outlined the extortionate payments demanded by Salinas's family, and self-serving inadmissible hearsay from Valenzuela.

This claim of falsity is baseless for the following reasons:

A.  Agent Chesson testified truthfully regarding the information she had available to her at the time of her testimony, which had been provided by Hernandez.  Agent Chesson truthfully informed the grand jury that Hernandez had told her she was extorted by Salinas and his family members.

B.  Agent Chesson's testimony on this point is corroborated by the evidence.  During the recorded December 2012 phone call between Hernandez and Valenzuela, Hernandez asks for her children back approximately 13 times.  Valenzuela responds by asking for more money.  Valenzuela repeatedly refuses to provide an amount of money owed, conduct consistent with her effort to continue to extort Hernandez by perpetually increasing the sum of money required to care for the children.  Valenzuela also pointedly refused to agree to a meeting, indicating that Hernandez should just "send it."

C.  Agent Chesson's testimony is further corroborated by the interview with Ibanez and Beecher in September 2012, during which Salinas and Delatorre pointedly refused to identify the location of the children and Delatorre expressly stated that the children would not be returned until additional money was paid.

Agent Chesson testified accurately with respect to the statements Hernandez made to her.  The evidence corroborates the testimony that this was not a normal "child care" situation.  Salinas, Delatorre, and Valenzuela all made extortionate demands for more money and refused to provide information regarding the whereabouts of the children.  The asylum declaration does nothing to contradict that premise, nor do the false and self-serving statements of Valenzuela, which constitute inadmissible hearsay.  As with preceding Claim #6, this purported "falsehood" is really a matter of defense argument.   The government submits that the evidence will support its argument that Salinas, his wife, and his mother-in-law used the children as collateral to extort money from Hernandez.  The defense is free to put in evidence and argue to the contrary.  There is no basis, however, for the Court to "rule" that the defense is right on this claim, any more than the Court can rule the defendant guilty based on the government's factual proffer.  The defense cannot win dismissal of an indictment based on arguments.  It must prove intentional, outrageous misconduct.  There is no evidence of such misconduct with this claim (or any other made by the defense).  The claim should accordingly be denied on this ground.

### 7.    Delatorre's Threats

Agent Chesson testified that Hernandez told her that Delatorre threatened that she would

1  report Hernandez to immigration authorities if Hernandez went to the police.  Exhibit 2, p. 29.

2  The defense claims that this testimony is false based on the fact that in April 2012, Delatorre

3  herself called the police, reported that the children were in Mexico, and reported both Hernandez and

4  Lopez for abandoning the children and making death threats against Delatorre and her family.

5  The defense claim on this point is baseless for the following reasons:

6  A. Agent Chesson truthfully testified to the facts provided to her by Hernandez, including
   Hernandez's description of receiving death threats from Salinas's mother-in-law and brother-

7  in-law, as well as Delatorre's threat to report her to immigration.

8  B. The evidence corroborates Hernandez's statements that she was afraid following the death
   threats by Salinas's family members.  Hernandez stated that she was too afraid to call the

9  police.  She did, in fact, flee the state of Washington to the Watsonville, California area
   during this period of time.

10

11 C. Delatorre's police report corroborates other aspects of Hernandez's statements to Agent
   Chesson, i.e. Delatorre admitted in the police report that she had contacted Hernandez and

12 Lopez in an effort to get money in connection with the children.

13 Agent Chesson testified truthfully regarding this issue, and there is no evidence to the contrary.

14 Hernandez told Agent Chesson that she was too afraid to call the police, and that she therefore left the

15 area and relocated to California.  Hernandez did, in fact, leave Washington within days after the April

16 2012 phone calls from Delatorre and move to California during this period of time.  Furthermore, the

17 police report filing by Delatorre regarding Hernandez's behavior does not contradict Hernandez's

18 statement that she was fearful as a result of Delatorre's threatening conduct.  In other words, even if

19 Hernandez had threatened Delatorre (and the government believes she did not), while that might be a

20 subject for cross-examination, that fact does not mean that Delatorre did not herself threaten Hernandez,

21 and the fact that her mother and brother freely employ death threats as a means of accomplishing their

22 objectives tends to corroborate Hernandez's version of events.

23 The defense has failed to provide evidence of an intentional falsity or an inaccuracy as to this

24 claim.  Nor has the defense proven materiality or prejudice.  There is no basis to dismiss on this ground.

25 **8.   Role of Threats In Hernandez's Departure from Washington**

26 Agent Chesson testified that Hernandez told her that Hernandez left Washington

27 because of Salinas's wife's threats to report Hernandez to immigration authorities.  Exhibit 2, p. 30.

28

UNITED STATES' OPPOSITION TO MOTION TO DISMISS INDICTMENT

The defense claims that this testimony was false for two reasons: (1) Hernandez ostensibly left Washington to avoid law enforcement investigation of her purported abandonment of her children and death threats purportedly made by Lopez to the defendants, and not because she was herself scared by threats made by Delatorre, her mother, and her brother; and (2) while immigration authorities did come to Hernandez's residence, they did so because they were looking for Lopez, not Hernandez.

The defense claim in this section is baseless for the following reasons:

A) Agent Chesson truthfully testified in the grand jury that Hernandez told her that she left Washington because of the threats received from Salinas's family members, threats which included death threats from Salinas's brother-in-law and mother-in-law and threats of a report to immigration from Delatorre.

B) Delatorre's manipulative and false efforts to report Hernandez did not result in any police action. The report was focused solely on an allegation of harassing phone calls.

C) Hernandez left Washington after Delatorre threatened to report her. And Delatorre apparently followed through on her threat, as immigration authorities in fact arrived at Hernandez's residence in Washington shortly after her departure.

Agent Chesson's testimony is entirely accurate as to these issues. Hernandez told the FBI that she had received threats and that she feared immigration. Given Delatorre's multiple admissions to police and other witnesses that she was attempting to extort money from Hernandez, and the violent and threatening nature of her family (in addition to her propensity for death threats, Valenzuela has two prior arrests for committing assaults in the United States), there was every reason to believe that Delatorre did threaten Hernandez. Immigration authorities did, in fact, stop by Hernandez's residence. The defense makes the frivolous claim that it should matter that the paperwork prepared by the immigration authorities reflects that they were looking for Lopez, and not Hernandez. This point is irrelevant. From Hernandez's perspective, she left because she was scared that Delatorre would follow through on her threat to contact immigration authorities, and the visit from immigration authorities suggests her fear in that regard was justified. Nor has the defense explained the materiality and prejudice resulting from this alleged false statement.

The defense has failed to demonstrate that there was anything about Agent Chesson's testimony on this point that was intentionally false, inaccurate, or material. The defense request for dismissal must therefore be denied on this ground.

### 9.    Valenzuela's Denial of Access To The Children

Agent Chesson testified that Valenzuela refused to allow Hernandez to directly communicate with the boys after Hernandez attempted to ask one of the boys for descriptions of their location that might assist Hernandez in finding them.  Exhibit 1, pp. 30-31.

The defense claims that this testimony is false based upon Valenzuela's own statements provided to Mexican social service workers.

This defense claim is false for the following reasons:

A.  Agent Chesson testified truthfully regarding Hernandez's statements on this issue.  Agent Chesson accurately informed the grand jury that Hernandez told her that Valenzuela denied her telephone access to her children after Hernandez inquired about their whereabouts.

B.   Agent Chesson did not have access to the Mexican Social Service papers (the DIF materials) at the time of her testimony, and therefore could not have known about Valenzuela's statements.

C.  Valenzuela's statements to the Mexican social service workers are inadmissible hearsay which cannot be considered as credible evidence.  They also appear to be self-serving and inaccurate.

D.  There is no credible evidence that Hernandez made the statement attributed to her in quotations in which she purportedly stated, "I don't care what you do with them, take them to DIF or leave them at the bridge."  Defense motion, pp. 8-9.

Agent Chesson testified accurately regarding these issues, and the defense has failed to provide any credible evidence that the testimony was intentionally false or even inaccurate.  This particular claim illustrates the defendant's misguided belief that it can claim "perjury" simply because it believes in a different version of events.  This claim is entirely based upon Valenzuela's statements to the Mexican social service agency.  Agent Chesson did not have access to the DIF reports at the time of her testimony.  Furthermore, these are statements from one of the charged defendants which the government believes to be inadmissible, are self-serving and are false.  They cannot provide a basis for a finding of inaccuracy regarding the government's testimony.  The government further objects to the defense effort to mislead the Court through its attribution of the "I don't care what you do with them, take them to DIF or leave them at the bridge" statement to Hernandez.  By placing the statement in quotation marks, the defense motion misleadingly suggests that this is an actual quote from Hernandez. It is not.  There is no credible evidence Hernandez ever said such a thing.  Nor has the defense demonstrated materiality or prejudice with respect to this claim.

As this claim is baseless, the motion to dismiss should be denied on this ground.

**10.    Reasons for Ibanez's and Beecher's Reluctance To Report Kidnapping**

Agent Chesson testified regarding the September 2012 meeting between Ibanez, Beecher, Salinas and Delatorre, in which Salinas and Delatorre affirmed their intent to continue to hold the boys hostage and extort Hernandez by using the boys as collateral.  Agent Chesson further testified that neither Ibanez nor Beecher reported the matter to law enforcement because they were concerned about an adverse immigration consequence to Hernandez.  Exhibit 2, p. 33.

The defense argues this testimony is materially inaccurate because Ibanez knew that Hernandez had previously disclosed Hernandez's immigration status through her filing of an asylum application. Ibanez had assisted with this filing and was thus aware of its submission.

This claim is baseless for the following reasons:

A.   Agent Chesson testified truthfully and accurately regarding her understanding of the dynamics of the meeting between Ibanez, Beecher, Salinas, and Delatorre, and her perception of the reasons for the actions of Ibanez and Beecher.

B.   While it is true that Hernandez had submitted asylum application materials in May 2012, Hernandez did not have actual legal immigration status until March 2013, when Homeland Security Headquarters issued its final concurrence regarding Hernandez's application. Therefore, Ibanez and Beecher may have reasonably continued to have concerns regarding the impact of a police report on Hernandez's status.

C.   Agent Chesson did not know about the asylum application at the time of her testimony, and thus had no reason to know that Ibanez was aware of the application.

This claim is specious.  There is no basis to believe that the agent provided intentionally false testimony on this point.  Moreover, there is no basis to think the agent's testimony is inaccurate.  It is perfectly consistent that Ibanez might be reluctant to report the circumstances regarding Hernandez's children even with her application pending for asylum.  In fact, one could argue Ibanez was even more reluctant to report the matter out of fear that it might cast a cloud over Hernandez's application.  It was reasonable for Agent Chesson to testify that Beecher and Ibanez may have not wanted to report the matter to law enforcement for immigration reasons.  Moreover, if Agent Chesson were mistaken on this point, the defense makes no effort whatsoever to explain how such a mistake would be material or serve to substantially prejudice the grand jury.

As the defense has failed to demonstrate intentional falsity, inaccuracy, or materiality on this point, the motion to dismiss should be denied on this ground.

### 11.    Salinas and Delatorre's Refusal To Return The Children and Ongoing Extortion

Agent Chesson testified that Delatorre and Salinas, in sum and substance, told the social worker Ibanez: (1) that they were not going to return the children to Hernandez; (2) that they were not going to give Sarani the address where her children were being held (3) they wanted more money from Sarani; and (4) she wasn't going to get her children back until Hernandez paid the money.  Exhibit 2, p. 32.

The defense argues that this testimony is misleading and "uncorroborated" based on comparisons to interview reports prepared by Agent Chesson and another FBI agent.

This defense claim is baseless for the following reasons:

A.   Agent Chesson testified truthfully regarding her recollection of her interview with Ibanez. Agent Chesson did not have access to the interviews by the assisting FBI agent, Special Agent Neil Rogers, at the time of her testimony.  In any event, the reports are consistent in indicating thay Delatorre did tell Ibanez that Hernandez was not going to get her children back until she paid more money.

B.   It is beyond dispute  in all 302's, irrespective of authorship and timing, that neither Salinas nor Delatorre provided Ibanez and Beecher with the location and address in Juarez for the boys, and that the couple, through Delatorre, stated additional money needed to be sent to Juarez for the boys during the meeting.

C.   Agent Chesson's testimony and the interview reports are completely consistent in documenting that Salinas and Delatorre continued to withhold information regarding the whereabouts of Hernandez's children, and Delatorre in her statements in the meeting linked the information to getting additional money from Hernandez, with Delatorre explicitly stating, according to Beecher, "not until she pays us."

Agent Chesson testified accurately regarding her recollection of her telephone interview with Ibanez.  Agent Chesson did not have access to Agent Rogers's interviews at the time of her grand jury testimony.  In particular, Agent Chesson accurately testified that there was evidence that the defendants were going to refuse to return the children unless they were paid. The defense has provided no credible basis to believe that Agent Chesson's testimony on this point was intentionally false or inaccurate.  In essence, the defense argument is that the indictment should be dismissed because it says the FBI interviews are materially inconsistent with the agent's testimony.  The defense claim is false.  Agent Chesson's testimony is largely consistent with the interview reports on the key points.  As with previous

1   claims, this is not really a good-faith claim of inaccurate testimony, but an effort by the defense to argue

2   that the facts should be viewed differently.  Agent Chesson accurately testified that there was evidence

3   that the defendants were going to refuse to return the children unless they were paid.  To the extent the

4   defense seeks to explore nuances in the phrasing of the interview reports, that may be an appropriate

5   matter for cross examination at trial, but it is a wholly inadequate basis upon which to seek pretrial

6   dismissal of an indictment.  As the defense claim of intentional falsity on this point lacks any factual

7   support, the motion to dismiss on this ground must be denied.

8                    **12.     Agent's Description of 2012 Recorded Phone Call**

9           Agent Chesson testified that during the monitored and recorded phone call in December 2012,

10  Hernandez asked for the children back, and Valenzuela refused and stated that Hernandez owed her

11  more money.  The defense appears to take issue with this characterization because Agent Chesson did

12  not include in her summary various self-serving statements made by Valenzuela which the defense

13  appears to deem exculpatory, such as Valenzuela's obviously false assertion that "I am not charging you

14  with anything," her statement that "this is not a kidnapping," and other statements seeking to falsely

15  characterize Hernandez's behavior and rationalize and justify Valenzuela's own extortionate conduct.

16          The defense claim on this point as to perjury is completely false, and the claim should not be

17  placed in this argument section.  There is not a single statement made by the agent regarding the phone

18  call that is inaccurate, and the defense makes no such claim.  Accordingly, to the extent the claim rests

19  on a perjury claim, the defense argument must be rejected.

20          The defense subsequently provides a more detailed argument regarding the phone call at pages

21  18-21 of its brief.  This section of the brief is devoted to the defendant's fanciful version of how it would

22  argue the phone call should be interpreted, and its claim that the phone call is exculpatory.  This

23  argument is equally specious as a matter of fact and law, but the government herein addresses the claim.

24          The defense argument is misplaced for several reasons.  First, the defendant's argument that the

25  phone call is exculpatory is based on the premise that the grand jury (and the Court) must take

26  Valenzuela's rationalizations and justifications in the call as if they were true.  Under the defense theory,

27  obviously false statements made by Valenzuela, such as "I'm not charging you for anything" and "I'm

28  not keeping them here kidnapped or anything like that" would have to be taken at face value and viewed

as exculpatory. The government rejects the premise. The statements emphasized by the defense are internally contradictory (Valenzuela repeatedly demands money during same phone conversation, and she ignores Hernandez's repeated requests for a return of the children and for information regarding their location) and are further contradicted by ample additional evidence in the case, including the statements of Hernandez, and the conduct of Salinas and Delatorre in continuing to demand money. They add no value to any fair assessment of the evidence in this case.

Second, assuming arguendo that Valenzuela's self-serving statements have some probative value, the defense is still arguing that the Court should dismiss the indictment based on the defense interpretation of the call. The defense argument regarding the exculpatory value is dubious, but to the extent it has any merit, that argument should be considered by a jury at trial, not through a motion to dismiss an indictment. The government anticipates playing the call at trial and believes it is a key piece of evidence in proving the defendants' complicity in the scheme. Indeed, contrary to the defense argument, the call confirms everything about the government's theory—Valenzuela has the children; she refuses to provide their location; she turns the situation on its head and blames Hernandez for the problem; and of course, she demands more money. Far from exculpatory, the phone call captures the essence of the illegal scheme concocted by Salinas, Delatorre, and Valenzuela.

Third, even if one could somehow view portions of the call as conceivably exculpatory, the defense has no basis to request a dismissal of the indictment based on the government's decision to not play or describe the contents of the entire call during its grand jury presentation. In United States v. Williams, 504 U.S. 36, 52-54 (1992), the Supreme Court held that the Fifth Amendment does not require a prosecutor to present exculpatory evidence to the grand jury. See also United States v. Jarrett, 447 F.3d 520, 529 (7th Cir. 2006) ("A court may not dismiss an otherwise valid indictment because the government failed to disclose substantial exculpatory evidence to the grand jury."); United States v. Angel, 355 F.3d 462, 475 (6th Cir. 2004) (the government has "no judicially enforceable duty to provide the grand jury with exculpatory evidence." ) Accordingly, while the government could have presented the entire phone call for context, the Supreme Court has clearly held that the government is not required, as a matter of law, to present exculpatory evidence, and the government is certainly not required to

present false, self-serving rationalizations by a defendant committing extortion as a part of its grand jury presentation.

In sum, the defense is free to argue that the contents of the recorded call should be interpreted in a certain manner at trial.  Those arguments, however, provide no basis for a pretrial dismissal of the indictment, particularly given that the agent accurately summarized the portions of the call which she described.

### 13.    Testimony Confirming Children With Valenzuela

Agent Chesson testified that it was important to her to hear Hernandez speak to one of the children and demand their return in terms of her evaluation of whether this was a kidnapping.  The defense argues that this is a false statement because the child on the phone did not say anything confirming the situation constituted an actual kidnapping.

This argument is facially baseless.  It is self-evident that the agent's expression of her view that it was important to hear the child's conversation with his mother is not a false statement, but the agent's articulation of her thought process in evaluating the evidence.  With the lack of candor that characterizes defendant's entire filing, the defense fails to inform the Court what the agent actually said in response to the question:

Q:    Okay.  Did Maria allow Sarani to speak with one of her children?

A:    Yes, she did.

Q:    And what was important to you to verify that this in fact was a potential kidnapping?

A:    Yes, because that proved to me that Maria did have the children, and I could hear-the detective told me that she was demanding the return of her children, and Maria continually refused and started asking for money and demanding money.

Exhibit 2, p. 37.

In other words, the agent testified that this portion of the recorded call was significant because it served to corroborate Hernandez's statements to law enforcement by proving that Valenzuela, in fact, had her children, and was providing access to them in the context of refusing to return them and asking for money.  To prove kidnapping, the government needed evidence that the children were alive and in

1   the custody of another person.  It made perfect sense for the agent to point out the importance of such

2   evidence in her testimony.

3         The defense cannot cite to anything inaccurate or misleading in this testimony.  The claim of

4   perjury is a false claim by the defense, and provides no basis to dismiss the indictment.

5               **14.**      **Status of Children At Time of Rescue**

6         Agent Chesson testified that agents found the children "around the corner at a school

7   playing" at the time of their rescue from Valenzuela.  Exhibit 2, p. 38.  The defense claim appears to be

8   that this statement is false and misleading because the defense can show that the children were enrolled

9   in school, and that describing them as "playing" was therefore somehow materially false.

10        This claim is frivolous.  Whether the children were playing, or studying math, or in science class,

11  is obviously not material, and the agent's testimony is based upon information provided to her by the

12  agents involved in locating the children.  Agent Chesson testified truthfully regarding her understanding

13  of where the children were, and what they were doing, at the time of the rescue.  Moreover, the children

14  could have been in school at the time of the rescue and, in fact, been playing at recess.  It appears that

15  the defense claim is that the agent did not phrase her response the way in the defense would prefer.  But

16  that is not the standard.  There is no basis to believe the agent's testimony is inaccurate regarding the

17  boys' activities at the time of the rescue.  The defense may have preferred the agent summarized the

18  facts in the manner most favorable to the defense, but the agent was not required to do so.  This absurd

19  claim should be rejected outright, as it cannot provide a basis to dismiss the indictment.

20        The sum and substance of these claims consists of the defense mostly taking issue with the

21  anticipated trial testimony of Hernandez.  The defense is free to cross examine and make arguments that

22  call that testimony into doubt; but the proper forum for that inquiry is at trial, not through a motion to

23  dismiss.  The defense has sought to manufacture "false" testimony by making arguments to the Court

24  regarding its view of the evidence.  The defense is free to make those arguments, but there is not a single

25  inaccuracy in the agent's testimony that supports the drastic relief of a dismissal of the indictment.  The

26  defense motion should accordingly be rejected.

27

28

### D.    Other misconduct claims

The defense offers a smorgasbord of additional misconduct claims in the hope that it can find one with an ounce of merit.  These claims are uniformly lacking in factual support and are legally baseless.  The government addresses each of these claims in turn.

### 1.    Questions posed by grand jurors

The defense takes issue with the prosecutor's handling of questions posed by a grand juror.  In particular, the defense alleges misconduct based upon the prosecutor's decision not to respond to two questions regarding the current location of the victims.

Grand jurors are entitled to ask questions and expect responses.  However, occasionally grand jurors will ask questions calling for irrelevant and possibly prejudicial information.  In responding to such questions, prosecutors have the responsibility to either limit or decline to respond to an inquiry which is not relevant and could result in a claim of grand jury abuse.  See United States v. Giorgi, 840 F.2d 1022, 1032 (1st Cir. 1988) (testimony regarding unrelated criminal acts not ground for dismissal of indictment where prosecutor admonished grand jury to consider only the case before them); United States v. De Rosa, 783 F.2d 1401, 1405 (9th Cir. 1986) (prosecutor's admonition to the grand jury alleviated any prejudice that may have occurred relating to testimony about prior criminal conduct not relevant to the charges under consideration).

In this case, the information sought by the grand jurors was irrelevant to the elements of the offenses.  The legal question before the grand jury was whether the government's presentation satisfied the elements of kidnapping and hostage taking.  The decision on where the children would be placed following their rescue from the illegal detention of the children committed by Salinas, Delatorre, and Valenzuela had no relevance to that question.  There was nothing wrong with the AUSA making the determination that such information was irrelevant to a consideration of the actual elements at issue, i.e. whether an unlawful detention of the victims had occurred.  Indeed, the government expects to move to exclude any such references at trial in this case, as they have no bearing on the question of whether the defendant knowingly engaged in the criminal conduct in this case.

Responding to these questions would have also injected unnecessary confusion into the grand jury's deliberations.  At the time of the grand jury testimony, the children were still in Mexico, and

government authorities in Mexico and the United States were still working through a process of determining the appropriate procedure for placing the children, and returning the children across international borders to their mother.  This process took some time and involved discussions with the U.S. Department of State, the Mexican social services agency, and California Child Protective Services, among other agencies.  (The process in fact took an extended period of time before the children were ultimately reunited with their mother in California, where they currently reside.)  Furthermore, as a practical matter, the government witness and prosecutor did not have access to the reports regarding the DIF investigation and evaluation of the children's status.  A discussion of the bureaucratic process would have been distracting and confusing, and would have taken the discussion away from the grand jury's task of considering whether the evidence satisfied the elements of the crimes alleged in the proposed indictment.

The AUSA's decision to decline responses to these questions was completely appropriate and reasonable to ensure that the grand jury was receiving relevant information, and to avoid unnecessary confusion.  Any claim of misconduct on this ground should accordingly be denied.

### 2.      The Government's Witness Did Not Engage in Vouching

As a general rule, neither a prosecutor nor a testifying government agent may express his personal opinion as to the credibility or reliability of a witness.  United States v. Rudberg, 122 F.3d 1199, 1204 (9th Cir. 1997); United States v. Williams, 989 F.2d 1061, 1071 (9th Cir. 1993); see also United States v. Wright, 625 F.3d 583, 610 (9th Cir. 2010).  "[P]rosecutorial misconduct may occur through the prosecutor's own vouching remarks or when the prosecutor elicits vouching testimony from witnesses."  Cheney v. Washington, 614 F.3d 987, 996 n.4 (9th Cir. 2010); United States v. Weatherspoon, 410 F.3d 1142, 1150 (9th Cir. 2005).  With that said, the Government is allowed to argue why the evidence and inferences therefrom show that the testimony of Government witnesses is credible.  United States v. Molina, 934 F.2d 1440, 1445 (9th Cir. 1991) (argument that defendant lied and the agent did not); United States v. Nash, 115 F.3d 1431, 1439 (9th Cir. 1997)(argument that defendant lied and Government witnesses had no reason to lie).

At trial, whether vouching results in substantial prejudice warranting reversal depends on several

1    factors:  the form of the vouching; the degree of personal opinion asserted; the extent to which the

2    vouching implied extra-record knowledge of the witness's truthfulness; and the importance of the

3    testimony in the overall context of the case.  Williams, 989 F.2d at 1072; see also Necoechea, 986 F.2d

4    at 1278.  In reviewing a vouching claim for plain error after trial, the Ninth Circuit "reverse[s] only if,

5    viewing the error in the context of the entire record, the impropriety seriously affects the fairness,

6    integrity, or public reputation of judicial proceedings, or where failing to reverse a conviction would

7    amount to a miscarriage of justice."  Necoechea, 986 F.2d at 1276 (internal quotations omitted); see

8    United States v. Brooks 508 F.3d 1205, 1212 (9th Cir. 2007) (where government's case strong, no

9    reversible plain error despite extensive vouching).

10          Nothing that occurred in Agent Chesson's testimony suggests any impropriety, and certainly not

11   a level of impropriety that either "seriously affects the fairness, integrity, or public reputation of judicial

12   proceedings," or amounts, absent reversal, to a miscarriage of justice.  For purposes of the vouching

13   argument, the defense focuses solely on Agent Chesson's statement that Hernandez's interview with the

14   FBI was consistent with the interview provided to the Watsonville Police Department.  Exhibit 1, p. 35;

15   Defense Motion to Dismiss, p. 23.  The defense then proceeds to rehash its prior arguments on the

16   reasons that the defendants should not have been charged in this case.  These arguments fail in the

17   vouching context for several reasons.

18          First, the agent's statements do not constitute vouching.  The agent's comments were not

19   extensive.  The agent simply stated that Hernandez's statements were largely consistent between the two

20   reports.  The statement did not imply any extra-record knowledge of any witness' veracity.  Indeed, the

21   agent simply pointed out that Hernandez had provided two different statements which were consistent

22   with respect to details of the crime.

23          Second, the defense argument that the reports are inconsistent is simply not borne out by a

24   review of the reports.  The government has attached the FBI interview report of December 3, 2012 as

25   Exhibit 4, to this opposition, and the Watsonville Police Report is attached as Exhibit 5.  A review of the

26   reports demonstrates that Hernandez's account regarding the details was consistent between the reports,

27   just as Agent Chesson stated.  In fact, and contrary to the misleading arguments of the defense, the

28   Watsonville Report and the FBI reports are completely consistent on the following facts, among others:

1. Hernandez's brother referred Hernandez to Salinas (referred to as Albor in the Watsonville Report)

2. Hernandez received assurances that Salinas/Albor had brought children over on other occasions

3. Hernandez paid Albor/Salinas $700

4. After picking up the children, Salinas/Albor said he needed an additional $600, and Hernandez sent it

5. Salinas/Albor then called Hernandez and told her he was "detained" at the border

6. Salinas/Albor told Hernandez that he would be leaving the children with Valenzuela

7. Salinas /Albor refused to take the children to Hernandez's mother in Michoacan

8. Salinas/Albor told Hernandez that he had spent her $1300

9. Hernandez called her children over the next several months and heard Valenzuela coaching them on what to say

10. Hernandez's son told her in one phone call that they boys witnessed a fatal shooting

11. Delatorre threatened Hernandez by saying she would call immigration authorities

12. Valenzuela threatened Hernandez

13. Valenzuela refused to state the amount of money necessary to release the children

These details, and many others, may be found in both the FBI interview and the Watsonville interview. See, Exhibits 4 and 5. The defense claim that the agent improperly vouched by noting the consistent details in the two reports is simply factually unsupportable.

The defense efforts to manufacture inconsistencies between the reports are transparently labored and unpersuasive. The defense seizes upon word choices and omissions between the reports, but fails to demonstrate any actual substantive inconsistencies. The defense also chooses to ignore the many details which are completely consistent between the reports, including the 13 summarized in the preceding paragraphs. The only conclusion is that the defense is seeking to make up inconsistencies where no genuine discrepancies exist. The defense is free to make such arguments at trial, but they fall far short of establishing the kind of prejudice and materiality necessary to support a motion to dismiss.

The defense has failed to provide any evidence of vouching. If the Court found that vouching had occurred, however, the government notes that vouching error is measured under a harmless error standard. Even in egregious cases, the Ninth Circuit has ruled that a Court must still determine whether

1   the error was harmless,  United States v. Solomon, 825 F.2d 1292, 1300 (9th Cir. 1987); United States v.

2   Hastings, 461 U.S. 499 (1983).  Accordingly, if there is any error, the defense must show prejudice.

3   United States v. Daas, 198 F.3d 1167, 1179 (9th Cir. 1999).  In this case, if one hypothetically assumed

4   Agent Chesson's statements constituted vouching, the statements were clearly harmless.  The statement

5   regarding the consistency in the reports was brief and innocuous, simply noting consistencies in the

6   reports.  Second, the evidence of kidnapping and hostage-taking in this case is extremely strong.  Indeed,

7   the defense cannot credibly dispute the 18-month detention of the children, the defendants' refusal to

8   return the children or identify their location, and the ongoing extortionate demands for money made by

9   the defendants in this case.  The evidence was sufficiently strong in support of the grand jury's probable

10  cause finding that any error regarding the agents' characterization of the reports would have been

11  harmless.

12          The defense has failed to demonstrate that vouching occurred in this case.  The agent's remarks

13  were innocuous, and they were accurate.  Hernandez's statements in the reports to the FBI and

14  Watsonville Police Department were generally consistent.  Finally, even if the Court evaluated the

15  statement under a vouching theory, the defense has failed to show prejudice.  Accordingly, the vouching

16  claim must fail.

17          **E.    The Government Is Permitted To Use Summary Witnesses, And Was Not Required
                    To Elicit The Testimony of Percipient Witnesses**

18

19          The Federal Rules of Evidence "do not apply in . . . [p]roceedings before grand juries."

20  Fed.R.Evid. 1101(d)(2).  This rule reflects the concept that the grand jury operates independently of the

21  courts.  Costello v. United States, 350 U.S. 359, 409 (1956).  The grand jury may obtain evidence from a

22  wide variety of sources, including hearsay; as the Supreme Court has stated: "The teaching of the

23  Court's decisions is clear: A grand jury 'may compel the production of evidence or the testimony of

24  witnesses as it considers appropriate, and its operation generally is unrestrained by the technical

25  procedural and evidentiary rules governing the conduct of criminal trials."  United States v. R.

26  Enterprises, Inc., 498 U.S. 292, 298 (1991) (quoting United States v. Calandra, 414 U.S. 338, 349

27  (1974).  Relaxation of the Rules of Evidence is in part due to the  fact that the grand jury is an

28  investigative entity rather than one that determines guilt beyond a reasonable doubt; therefore, "[s]trict

1    observance of trial rules in the context of a grand jury's preliminary investigation 'would result in

2    interminable delay but add nothing to the assurance of a fair trial.'" R. Enterprises, Inc., 498 U.S. at 298

3    (quoting Costello v. United States, 350 U.S. 359, 364 (1956)).

4         Thus, an indictment may be based solely upon hearsay.  Costello, 350 U.S. at 363; United States

5    v. Rosario, 234 F.3d 347, 352 (7th Cir., 2000).  See also United States v. Walker, 410 F.3d 754, 758 (5th

6    Cir. 2005) (hearsay permitted in grand jury but not at trial); United States v. Waldon, 363 F.3d 1103,

7    1109 (11th Cir. 2004)(sitting grand jury may consider hearsay testimony from earlier grand jury);

8    United States v. Ortiz de Jesus, 230 F.3d 1, 4 (1st Cir. 2000)(no prohibition on either the presentation of

9    hearsay evidence to a grand jury or to the grand jury's use of that hearsay evidence in determining

10   whether to indict).

11        Because hearsay is permitted, it is common, as in this case, for the government to present an

12   entire case to the grand jury solely through testimony of a single case agent who simply summarizes the

13   evidence, including the hearsay statements of witnesses who have been interviewed.  A grand jury "may

14   compel the production of evidence or the testimony of witnesses as it considers appropriate, and its

15   operation generally is unrestrained by the technical procedural and evidentiary rules governing the

16   conduct of criminal trials."  United States v. Calandra, 414 U.S. 338, 343 (1974); see also United States

17   v. Williams, 504 U.S. 36 (1992).  "The validity of an indictment is not affected by the form of the

18   evidence considered, and an otherwise valid indictment cannot be challenged on the ground that the

19   grand jury based it on inadequate or incompetent evidence." United States v. Taylor, 154 F.3d 775, 681

20   (7th Cir. 1998)(citing Costello), 350 U.S. at 363-64.  See also United States v. Kamerud, 326 F.3d 1008,

21   1015 98th Cir. 2003); United States v. Landham, 251 F.3d 1072, 1080 (6th Cir. 2001); United States v.

22   Ortiz de Jesus, 230 F.3d 1,4 (1st Cir. 2000); Government of Virgin Islands in Interest of A.M., 34 F.3d

23   153, 161 (3rd Cir. 1994).

24        The government presented its summary evidence in this case through a witness who truthfully

25   and accurately summarized the facts.  That testimony provided evidence as to each of the elements of

26   the alleged crimes sufficient to support the grand jury's probable cause finding.  There is no indication

27   that the grand jury requested testimony from additional witnesses.  The government's method of

28

UNITED STATES' OPPOSITION TO MOTION TO DISMISS INDICTMENT
CR 12-00887-EJD                                  32

presentation was squarely within the rules and did not constitute error.  The defense arguments to the contrary should accordingly be rejected.

### F.      The Government's Intent To Supersede

As noted by the defense, the government has indicated that it is likely to supersede the indictment in this case, if this matter proceeds to trial.  The government herein affirms that evaluation is ongoing, particularly in light of the undisputed evidence of the extortionate activity undertaken by Salinas, Delatorre, and Valenzuela in late 2012 in continuing to use the minor victims as collateral to extract additional funds from Hernandez.

The defense has suggested the Court set a deadline for that presentation.  The government will make such a presentation, if any, in a manner that precludes disruption of the schedule in this case as much as possible.  The government respectfully objects, however, to a deadline within 30 days of the hearing in this case.  The government will inform the Court and defense of its plans in this regard.

The defense also proposes a number of novel suggestions for the Court to manage the presentation of evidence in a superseding indictment, including ordering the government to present certain exhibits to the grand jury in a certain manner.  With absolute respect to the Court and appreciation for the defendant's input, the government respectfully submits that the defense request violates basic separation of powers concepts in the United States Constitution, as neither the defense nor the Court has a role in presenting matters to the grand jury. The government therefore respectfully requests that the defense motion for such an order be denied.

### IV.  CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny defendant's motion to dismiss.

DATED:   October 9, 2014                                   Respectfully submitted,

                                                          MELINDA HAAG
                                                          United States Attorney


                                                          _____/s/_____
                                                          JEFFREY D. NEDROW
                                                          JEFFREY B. SCHENK
                                                          Assistant United States Attorneys