# EXHIBIT 1

MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

JEFFREY D. NEDROW (CABN 161299)
JEFFREY B. SCHENK (CABN 234355)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5045
    FAX: (408) 535-5066
    jeff.nedrow@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: CR 12-00887-EJD |
| Plaintiff, | |
| v. | DECLARATION OF CHRISTINA L. CHESSON |
| JESUS SALINAS and PATRICIA DE LA TORRE, | |
| Defendants. | |

I, CHRISTINA L. CHESSON, declare:

    1. I am a Special Agent with the Federal Bureau of Investigation. I have been employed as an investigator with the FBI since 1995. During my 19 years with the FBI, I have conducted and/or participated in numerous investigations involving bank robberies, narcotics, fraud, kidnapping, and other violations of federal statutes. From 2012 through the present date, I have been assigned as the case agent on the federal investigation of Jesus Salinas, Patricia Delatorre and Maria Guadalupe Valenzuela Castaneda for their alleged role in kidnapping and holding hostage the juvenile children of Sarani Hernandez.

1

2. I have testified in the grand jury in connection with my investigation of the Salinas kidnapping case. I have reviewed a transcript of my testimony in the grand jury on December 19, 2012. I hereby affirm that my testimony in the grand jury was true and accurate to the best of my knowledge.

3. There were a number of documents pertinent to this case that I did not have in my possession at the time of testimony on December 19, 2012. These documents include the reports prepared by the Mexican Social Services known by the acronym of "DIF." I also did not have the border crossing records regarding Salinas's attempted border crossing with the children in the summer of 2011. In addition, I did not have the final reports of interview prepared by Special Agent Neil Rogers with respect to the statements of Elizabeth Ibanez and Josefina Beecher. I also did not have a copy of the declaration Hernandez filed in support of her asylum application.

4. I have reviewed defendant Salinas's September 18, 2014 filing in which he accuses me of intentionally committing perjury in my grand jury testimony. Salinas's allegations are false. I did not intentionally make any false statements during my grand jury testimony on December 19, 2012.

5. At the time of my 2012 grand jury testimony, I believed the evidence supported charges of kidnaping and hostage-taking against Salinas, Delatorre and Valenzuela Castaneda, and I still believe the evidence supports the charges in this case.

6. I am aware that the defense has argued that I made intentionally false statements with respect to 14 specific statements during my grand jury testimony. I have organized this declaration to respond to each of these 14 allegations, as follows:

A. <u>Immigration Status of Hernandez</u>

I testified that Ms. Hernandez was a Mexican citizen, and that she was not in the U.S. legally.

I believed this statement was accurate at the time of my testimony, and I still believe it to be accurate. My testimony was based on the following facts. I understood from my conversations with Hernandez and my review of records that Hernandez had crossed the border illegally and was an undocumented alien. I was aware at the time of my testimony that Hernandez had applied for asylum, but I did not know the status of that application, and I was unaware that a preliminary recommendation had been made in October 2012 to grant approval of that application. I did not become aware of this

fact until after my grand jury testimony. I have subsequently become aware that the asylum application was not final in October 2012, and was actually not finalized until approximately March 2013.

B. <u>Location of Children</u>

I testified that Hernandez left her three children with her mother when she returned to the United States in 2011.

I believed this statement was accurate at the time of my testimony, and I still believe it to be accurate. My testimony was based on the following facts. Hernandez told me that she left the children in the care of her mother. Her statement was corroborated by the statements of the boys, who stated during FBI forensic interviews in April 2013 that they were living with Hernandez's mother during the 2011 time period. In addition, the older brother of the two kidnap victims, herein identified as "E.L.," was also interviewed by the FBI. E.L. stated that the two younger boys lived with Hernandez's mother when she returned to the United States in 2011. Furthermore, Enrique Lopez, Hernandez's boyfriend, was interviewed by the FBI. Lopez told the FBI that he had understood his mother played a role in transporting the boys to meet with Salinas, but that the boys had not lived long-term with his mother. I am aware that the children provided inconsistent statements on this issue to the DIF officials following their rescue in 2012. However, I was not aware of those statements at the time of my testimony, as I did not have the DIF documents at that time.

C. <u>Hernandez's Lack Of A Prior Connection to Salinas</u>

I testified that Hernandez said she had no prior connection to Salinas, stating that her "brother put her in contact with someone that a friend of his knew" who had helped children cross the border before.

I believed this statement was accurate at the time of my testimony, and I still believe it to be accurate. My testimony was based on the fact that Hernandez told me that she did not know Salinas prior to the referral through her brother.

Following my grand jury testimony, I learned that Delatorre made statements in a police report dated April 24, 2012 which was prepared by the Mount Vernon Police Department. In that report, Delatorre told the Mount Vernon Police that "her (Delatorre) husband (Salinas) knows Enrique's wife's (Hernandez) brother (Juan)." Through this link, Delatorre and her husband (Salinas) had met Enrique and Sarani Hernandez."

D. <u>The 2011 Border Crossing Attempt</u>

I testified that I was unable to find any record of Salinas being detained during my check of criminal history records.

I believed this statement was accurate at the time of my testimony, and I still believe it to be accurate. My testimony was based on the following facts. I had researched criminal history records and sought border processing records regarding Salinas's 2011 border crossing. I was not aware of any evidence that Salinas was "detained" by border officials at the time of my testimony. As I stated in my testimony, my request for border processing records was pending; I did not receive the records until January 2013.

Since receiving the records, I have reviewed them. While Salinas was referred for secondary questioning, there is no reference to his being "detained" in the reports.

In February 2013, I interviewed the border crossing officers in El Paso involved in questioning Salinas on the date of the attempted border crossing. Those agents stated that Salinas was asked to step out of line for a brief interview regarding the border crossing of the children. They did not tell me that Salinas was detained.

E. <u>Salinas's Placement of Children With Valenzuela Over Hernandez's Objection</u>

I testified that Hernandez "insisted" that her children be taken to her mother in Michoacan after Salinas took her children to Juarez.

4

I believed this statement was accurate at the time of my testimony, and I still believe it to be accurate. My testimony was based on the following facts. Hernandez told me that she repeatedly asked for the children to be sent to her mother. She told me that she strongly wanted the children to be sent to her mother. I do not recall if she used the word "insisted" or if I used that word, but I think it accurately described what she told me was the strength of her views.

I was aware at the time of my testimony of the recorded phone call Hernandez made to Valenzuela at my direction on December 3, 2012. In that call, Hernandez asked Valenzuela several times for her children back. Valenzuela responded by demanding more money from Hernandez.

I was also aware at the time of my testimony of Hernandez's statements to the Watsonville Police Department, in which she had also stated that she asked Salinas to return her children to her mother in Michoacan.

F. Testimony Regarding Extortionate Demands for Money by Salinas's Mother-in-Law

I testified that Hernandez told me that Valenzuela repeatedly demanded money, and refused to provide the address and location of her children.

I believed this statement was accurate at the time of my testimony, and I still believe it to be accurate. My testimony was based on the following facts. Hernandez told me that she was extorted by Salinas and his family members. I felt her statement had been corroborated by the phone call we recorded between Hernandez and Valenzuela on December 3, 2012. During the recorded December 2012 phone call between Hernandez and Valenzuela, Hernandez asks for her children back many times. Valenzuela responds by asking for more money. Valenzuela also repeatedly refused to provide an amount of money owed. Valenzuela also refused to agree to a meeting, indicating that Hernandez should just "send it." I felt these statements were consistent with Hernandez's statement that she had been extorted by Valenzuela, her daughter, and her son-in-law.

At the time of my testimony, I had also spoken with Elizabeth Ibanez. I was aware that in

the meeting Ibanez had with Salinas and Delatorre in September 2012, Salinas and Delatorre both refused to identify the location of the children and Delatorre expressly stated that the children would not be returned until additional money was paid.

G. Delatorre's Threats

I testified that Hernandez told me that Delatorre threatened that she would report Hernandez to immigration authorities if Hernandez went to the police.

I believed this statement was accurate at the time of my testimony, and I still believe it to be accurate. My testimony was based on the following facts. Hernandez told me that she had received numerous threats from members of Salinas's extended family, including the statement that she had received death threats from Valenzuela and Fernando Delatorre. In addition, Hernandez told me that Delatorre threatened to report her to immigration. I believed Hernandez when she told me that she was scared because of these threats, as fear seemed a reasonable reaction to such threats. In addition, I knew Hernandez had, in fact, moved to California.

Following my grand jury testimony, I have become aware of an April 2012 report taken by the Mount Vernon Police Department which corroborates Hernandez's statements to me regarding the threats. Specifically, in the report, Delatorre stated that she had contacted Hernandez and her boyfriend, Lopez, because Hernandez owed her money.

H. Role of Threats In Hernandez's Departure from Washington

I testified that Hernandez told me that Hernandez left Washington because of Delatorre's threats to report Hernandez to immigration authorities.

I believed this statement was accurate at the time of my testimony, and I still believe it to be accurate. My testimony was based on the following facts. Hernandez told me that she left Washington because of the threats she received from Salinas's family members, threats which included death threats from Salinas's brother-in-law and mother-in-law, and threats of a report to immigration from Delatorre.

I knew that Hernandez had, in fact, left Washington and moved to California in approximately April 2012.

Following my grand jury testimony, I have become aware of an April 2012 report taken by the Mount Vernon Police Department which corroborates Hernandez's statements to me regarding the threats. Specifically, in the report, Delatorre stated that she had contacted Hernandez and Hernandez's boyfriend, Lopez, because Hernandez owed her money.

I am further aware that immigration officials did, in fact, visit Hernandez's residence shortly after she left Washington.

I. <u>Valenzuela's Denial of Access To The Children</u>

I testified that Valenzuela refused to allow Hernandez to directly communicate with the boys after Hernandez attempted to ask one of the boys for descriptions of their location that might assist Hernandez in finding them.

I believed this statement was accurate at the time of my testimony, and I still believe it to be accurate. My testimony was based on the following facts. Hernandez told me that Valenzuela denied her telephone access to her children after Hernandez inquired about their whereabouts. I have been informed that there are statements in DIF records made by Valenzuela that contradict Hernandez's statement to me. However, I did not have possession of those documents at the time of my testimony in the grand jury.

J. <u>Reasons for Ibanez's and Beecher's Reluctance To Report Kidnapping</u>

I testified that neither Ibanez nor Beecher reported the kidnapping to law enforcement because they were concerned about an adverse immigration consequence to Hernandez.

I believed this statement was accurate at the time of my testimony, and I still believe it to be accurate. My testimony was based on the following facts. I knew Ibanez was attempting to assist Hernandez with her problems, and it was my understanding that she was concerned that Hernandez

7

might be deported. I did not know at the time of my testimony that Ibanez had helped Hernandez with her asylum application.

K. <u>Salinas and Delatorre's Refusal To Return The Children and Ongoing Extortion</u>

I testified that Delatorre and Salinas, in general terms, told the social worker Ibanez: (1) that they were not going to return the children to Hernandez; (2) that they were not going to give Sarani the address where her children were being held (3) they wanted more money from Sarani; and (4) she wasn't going to get her children back until Hernandez paid the money.

I believed this statement was accurate at the time of my testimony, and I still believe it to be accurate. My testimony was based on the following facts. I had spoken to Elizabeth Ibanez on the phone within a short time prior to my grand jury testimony, and I believe my testimony accurately reflects what she told me about the meeting. I have also reviewed the reports prepared by Special Agent Neil Rogers regarding his subsequent interviews with Ibanez and Beecher. I did not have those reports at the time of my testimony, but I believe that they are consistent with my testimony.

L. <u>Description of 2012 Recorded Phone Call</u>

I testified regarding the monitored and recorded phone call in December 2012.

I believed my statements regarding that call were accurate at the time of my testimony, and I still believe it to be accurate. My testimony was based on statements made to me at the time of the call by Spanish-speaking law enforcement officers reviewing the call, my review of a transcript prepared following the call by an FBI linguist, and my discussions after the fact with Hernandez.

M. <u>Testimony Confirming Children With Valenzuela</u>

I testified that it was important to me to hear Hernandez speak to one of the children and demand their return, in terms of my evaluation of whether this was a kidnapping.

This statement was my investigative opinion regarding my professional evaluation of the case. I was concerned as to whether there was evidence proving that the children were alive and living with

Valenzuela. When I heard one child speak on the phone, and another in the background, it corroborated for me Hernandez's statements, specifically by proving that Valenzuela, in fact, had Hernandez's children, and was providing access to them in the context of refusing to return them and asking for money.

N. <u>Status of Children At Time of Rescue</u>

I testified that agents found the children "around the corner at a school playing" at the time of their rescue from Valenzuela.

I believed this statement was accurate at the time of my testimony, and I still believe it to be accurate. My testimony was based on the following facts. I was not involved in the rescue of the children. However, agents involved in rescuing the children told me that the children were found at a school playing at the time of their rescue. I have no reason to disbelieve the agents' description of where the children were at the time of the rescue, and believe their statements to be true and accurate.

<u>Vouching Claim</u>

7. I further understand that the defense has suggested I testified falsely when I said Hernandez's statements were consistent in their details.

I believed this statement was accurate at the time of my testimony, and I still believe it to be accurate. My testimony was based on the following facts.

I have reviewed the FBI interview reports from December 3, 2012 and also reviewed the November 27, 2012 Watsonville Police Report of interview with Hernandez. In reviewing the reports, I noted that the statements were very consistent in their details. Among many consistent details, I noted both reports included the following statements by Hernandez in describing the events of the kidnapping:

1. Hernandez's brother referred Hernandez to Salinas (referred to as Albor in the Watsonville Report)

2. Hernandez received assurances that Salinas/Albor had brought children over on other occasions

3. Hernandez paid Albor/Salinas $700

4. After picking up the children, Salinas/Albor said he needed an additional $600, and Hernandez sent it

5. Salinas/Albor then called Hernandez and told her was "detained" at the border

6. Salinas/Albor told Hernandez that he would be leaving the children with Valenzuela

7. Salinas /Albor refused to take children to Hernandez's mother in Michoacan

8. Salinas/Albor told Hernandez that he had spent her $1300

9. Hernandez called her children over the next several months and heard Valenzuela coaching them on what to say

10. Hernandez's son told her in one phone call that they boys witnessed a fatal shooting

11. Delatorre threatened Hernandez by saying she would call immigration authorities

12. Valenzuela threatened Hernandez

13. Valenzuela refused to state the amount of money necessary to release the children

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge at Watsonville, California on October 8, 2014.

CHRISTINA L. CHESSON
Special Agent, FBI